**ILLINOIS POWER COMPANY,**
Petitioner-Appellant,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 85–1960.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 28, 1986.

Decided June 6, 1986.

---

Edward C. Rustigan, Mayer, Brown & Platt, Chicago, Ill., for petitioner-appellant.

William A. Whitledge, Dept. of Justice, Tax Div., Washington, D.C., for respondent-appellee.

Before POSNER and FLAUM, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

POSNER, Circuit Judge.

Illinois Power Company asks us to reverse a decision of the Tax Court assessing a deficiency in the company's 1975 federal income taxes of $7 million and a deficiency in its 1976 federal income taxes of $0.6 million. 83 T.C. 842 (1984). The assessment for 1975 relates to investment tax credit, the assessment for 1976 to certain receipts that the government characterizes as income. Although the issues raised by these two assessments are unrelated as a matter of substantive law, both involve the recurrent issue in tax law—in law, period—of how to classify into just two categories phenomena that are continuous rather than dichotomous. Compare *Stephens v. Heckler*, 766 F.2d 284, 286 (7th Cir.1985).

■ 1. In 1975 Congress increased the investment tax credit for utilities from 4 percent to 10 percent, and provided that the higher credit would apply to property "the construction ... of which is completed by the taxpayer" to the extent of costs incurred in construction between January 21, 1975, and January 1, 1977 (when the higher credit was to expire—it was later extended to January 1, 1981), and to property "acquired" by the taxpayer if it was acquired between those dates. 26 U.S.C. § 46(a)(1)(D) (Supp. V 1975). (For similar distinctions made elsewhere in the Internal Revenue Code see 26 U.S.C. §§ 48(a)(1)(C) (elevators and escalators), 48(a)(7)(B) (property completed or predominantly constructed abroad), 48(*l*)(2)(B) (certain property used to produce energy), 167(c) (choice of depreciation methods), 169(d)(4)(A) (pollution control facilities).) In 1967 Illinois Power Company, a large electric utility in Illinois, began building the Baldwin Power Station, a coal-fired electrical generating complex consisting of three separate generating units. Unit 3, the one involved in this case, consists of an enormous boiler, a generator, pumps, and other equipment, plus structures for housing the equipment. It was begun in 1971 and completed, at a total cost of $127 million, on June 20, 1975, which Illinois Power deems the date of acquisition for purposes of figuring the 10 percent investment tax credit. The government's position, sustained by the Tax Court, is that Illinois Power built rather than bought Unit No. 3, and therefore can apply the 10 percent credit only to the (modest) fraction of construction costs incurred after January 21, 1975. The burden of proving entitlement to the investment tax credit was on Illinois Power, *Illinois*

*Cereal Mills, Inc. v. Commissioner*, 789 F.2d 1234, 1239 (7th Cir.1986), and we can set aside the findings of fact made by the Tax Court only if they are clearly erroneous, see 26 U.S.C. § 7482(a); *Falkoff v. Commissioner*, 604 F.2d 1045, 1049 n. 6 (7th Cir.1979). Legal characterizations, such as whether Unit No. 3 was built or acquired within the meaning of the statute, are, for these purposes, findings of fact, not conclusions of law. *Mucha v. King*, 792 F.2d 602, 604–06 (7th Cir.1986).

Section 1.48–2(b)(1) of the Income Tax Regulations, the validity of which is not questioned, provides that property is considered to be constructed by the taxpayer "if the work is done for him in accordance with his specifications." This adds very little to the statute, and the only possibly pertinent cases are divided, with the Tenth Circuit and the Court of Claims supporting the position taken by Illinois Power, but the Court of Claims' successor, the Federal Circuit, supporting the position taken by the Internal Revenue Service. Compare *Public Service Co. v. United States*, 431 F.2d 980, 983–84 (10th Cir.1970); *Lykes Bros. S.S. Co. v. United States*, 513 F.2d 1342 (Ct.Cl.1975), and *Pacific Far East Line, Inc. v. United States*, 513 F.2d 1355 (Ct.Cl.1975), with *Hawaiian Independent Refinery, Inc. v. United States*, 697 F.2d 1063 (Fed.Cir.1983). The issue is too fact-bound, and the cited cases too remote factually from the present case, for us to be able to derive much guidance from them. Although the facts of the Tenth Circuit case (decided for the taxpayer) are closest to those of the present case, it may be important that the court was affirming (i.e., finding not *clearly* erroneous) a finding that the taxpayer had acquired rather than constructed the power plant in issue there. Moreover, it was a "turnkey" transaction, in which the utility's participation in the design and construction of the plant was minimal; that participation was more extensive here, in part because this was a larger project.

The underlying facts in this case (as distinct from their legal characterization) are undisputed, and, much simplified, are as follows. Illinois Power hired Sargent & Lundy, an engineering firm specializing in the design of electric generating plants, to manage the Baldwin Power Station project. Sargent & Lundy designed Unit No. 3 (as it had designed the preceding stages of the project). The task of design involved the preparation of thousands of engineering drawings. Sargent & Lundy also assisted Illinois Power in procuring the construction contractor, Baldwin Associates (a joint venture of four construction companies). But the construction contract was between Baldwin and Illinois Power, and while Baldwin was authorized to buy materials used in the actual construction, Illinois Power contracted directly for the boiler and other equipment to be installed in Unit No. 3. Sargent & Lundy formulated the specifications for these contracts, subject of course to Illinois Power's approval, as it had formulated the specifications for the contract with Baldwin. As equipment and materials were brought on to the construction site they became the property of Illinois Power. Illinois Power stationed several engineers and clerical personnel at the site to monitor Baldwin's performance; Sargent & Lundy had a much larger staff at the site monitoring that performance. Illinois Power also hired a testing laboratory to test the structural steel erected by Baldwin.

Do these facts add up to Illinois Power's having bought Unit No. 3 when it was completed in June 1975, or to its having built it, beginning in 1971 when construction started? In one sense the question no more admits of an answer than the question whether dusk is day or night. Construction and acquisition are two ends of a continuum rather than distinct compartments, and in the middle of the continuum any classification is bound to be somewhat arbitrary. We must ask not which classification of Illinois Power's role in the Baldwin project is more faithful to the Platonic essences of the concepts "construction" and "acquisition" but which will best advance the purpose of the statute. The purpose of an investment tax credit is to stim-

ulate investment, and logically therefore it ought only be available for investments made after the credit is enacted or at least clearly foreseen.

It has often been said, most recently in our opinion in *Illinois Cereal Mills, Inc. v. Commissioner, supra,* at 1239, that the investment tax credit "should be construed liberally in light of its purposes, ... and that the purpose ... is to promote investment." (Citation omitted.) But when courts say that statutes should be construed "liberally" (often that "remedial" statutes should be construed "liberally"), usually and here all they mean is that, unless some reason to the contrary appears, a statute should not be interpreted in a crabbed or niggling manner that will defeat the legislature's apparent purposes. This precept has little application in this case; the result for which Illinois Power contends would not advance the statutory purpose of encouraging investment.

The 10 percent credit took effect on March 29, 1975, and was originally intended to last for only two years. It was given a modest retroactive effect to January 20, 1975, but appropriately, since by then the enactment of the higher credit was clearly foreseen and could therefore encourage investment. If Illinois Power had gone out on January 20 and plunked down $127 million to buy a power plant, it would have been doing just what Congress wanted companies to do—invest, knowing they could take a higher credit against their federal income tax liability if they did so. If, however, Illinois Power merely took delivery on January 20 (or, as in fact happened, June 20) of a plant for which it had been paying for years—a plant conceived and nearly completed long before the higher credit was enacted or even foreseen— the application of the credit would confer a windfall. Illinois Power might use its tax savings to make additional capital investments, but equally it might use them to pay higher dividends or, more realistically perhaps, since it is a regulated utility, might be forced to pass on the tax savings to its ratepayers.

So there is an argument for interpreting a complex and protracted transaction that has elements of both construction and acquisition as construction, in order to match the taxpayer's outlays with the investment tax credit (if any) that is in force when the outlays are made, and hence for resolving a close case such as this in favor of characterization as construction. (Later we shall see that there may be an alternative method of assuring matching, but not one that the taxpayer in this case has tried to use, or that would give it the tax benefit that it seeks.) The transaction would nevertheless have to be classified as acquisition (unless the words of the statute are to be ignored completely) if Illinois Power had simply hired Sargent & Lundy to provide it with a turnkey operation—a completed power plant to be turned over to it upon completion in June 1975—just as it would have to be classified as construction if the physical construction had been done by employees of Illinois Power's construction department rather than by Baldwin Associates. Really the operation is best described as assembly, with Illinois Power in the central role of assembler. Illinois Power hired Sargent & Lundy to design the plant and assist in the selection and supervision of the contractors. Baldwin Associates was the principal but by no means only contractor. It built the structures that house the equipment, it installed the equipment, but it did not supply the equipment. The equipment was supplied by other contractors of Illinois Power. Illinois Power supplied on-site inspection and monitoring through its own staff as well as that of its agent Sargent & Lundy. Illinois Power's role approximated that of a prime contractor, Sargent & Lundy's role that of an architect, and the roles of Baldwin Associates and the equipment suppliers those of subcontractors.

Alternative characterizations are possible. If a Mr. Lundy hired an architect to design a house for him and then made a contract with a builder to build it, Lundy would not be the builder. And if construction of the house was completed on January 20, 1975, and Lundy was somehow enti-

tled to an investment tax credit, he would (subject to a possible qualification noted below) enjoy the windfall we described earlier. But in cases of doubt, this characterization should be avoided in order to promote the objectives of the tax credit. It can be avoided here, by imagining the difference it would make if, in our hypothetical case, Lundy, instead of signing a contract with a builder, contracted separately with the builder, the plumber, the electrician, etc. Then we would say that Lundy was his own prime contractor, that he had built the house. Illinois Power was in a similar position with respect to Unit No. 3. It was not willing to turn control of the project over to Sargent & Lundy and Baldwin Associates or to both together. It not only maintained a presence with trained personnel at the worksite every day the project was in progress but it contracted separately with the suppliers of the equipment. It signed, indeed, more than 40 separate contracts. Unit No. 3, remember, is not a building. It is a power plant. The housing is not the most important component. The biggest component, both in size and in price, is a 10,000 ton boiler. Illinois Power bought the boiler directly from the manufacturer and supervised its installation by Baldwin. In short, Illinois Power coordinated, though with much help from Sargent & Lundy, a complex melding of construction, equipment installation, and design. It "constructed" Unit No. 3 within what seems to us the most pertinent meaning to assign to the word. That it could not have done less than it did—that the purchase of such a large project on a turnkey basis is infeasible—is, even if true, irrelevant. The statute allows investment tax credit for construction as well as acquisition, and Illinois Power would have been entitled to the 10 percent credit if it had incurred the construction expenses during the statutory period.

So we think the Tax Court was right; but in any event its finding that Illinois Power constructed rather than acquired Unit No. 3 is not clearly erroneous. As we said earlier, the application of a legal standard to a particular constellation of facts is itself a finding of fact for purposes of allocating decisional competence between trial courts (as for purposes of our review the Tax Court is) and appellate courts. This conclusion is decisive against the taxpayer's argument.

One final point. Even if Illinois Power were right that Sargent & Lundy had constructed the plant and Illinois Power had acquired it, it would not necessarily follow that Illinois Power had acquired it on the date of completion. Analogy to the question when an asset under construction is acquired for purposes of determining whether the acquirer's gain from a later sale of the asset is a short term or a long term capital gain suggests that piecemeal acquisition would be the proper characterization of what Illinois Power did—if it was not (as we believe) better characterized as construction. See, e.g., *Paul v. Commissioner*, 206 F.2d 763 (3d Cir.1953); *Russo v. Commissioner*, 68 T.C. 135, 148–51 (1977). The regulations on the investment tax credit, so far as relevant here, merely provide that "property shall be deemed to be acquired when reduced to physical possession, or control." 26 C.F.R. § 1.48–2(b)(6). As Unit No. 3 went up, the right to control vested in Illinois Power; the more that was built, the more Illinois Power owned. But we need not decide in this case whether Illinois Power would not be entitled to as much investment tax credit as it claims even if its basic legal position were correct; we mention the issue only so that our opinion will not be thought to have resolved it implicitly. We affirm the Tax Court's decision assessing a deficiency in Illinois Power's 1975 federal income tax payments and move on to the 1976 deficiency.

2. In 1974 the Illinois Commerce Commission, which regulates Illinois Power's rates, ordered the company to raise its rates to certain commercial customers. The reason was not to make Illinois Power better off but to limit the consumption of electricity by exploiting the inverse relation between price charged and quantity demanded (what economists call the "Law of Demand"). When the price of a good or

service rises, consumers search harder for substitutes, which now cost (relatively) less. The Commission wanted to encourage this search by making Illinois Power charge more for electricity. The Commission made clear that this was its purpose and that therefore Illinois Power would not be able to keep the money it collected. But it did not specify the precise manner in which Illinois Power would have to disgorge the money, or when, or to whom, or with what interest; nor did it require that the money be segregated from Illinois Power's other funds, though it did say that the money "shall be accumulated by the Company in a special fund." It was not till 1979 that the Commission decided that the money would be disbursed in the form of a credit on the utility bills of all of Illinois Power's customers. The Tax Court nevertheless held that this money (called "Rider R" revenues by the parties) was income when received and was therefore taxable then.

In defense of this surprising result the government invokes the principle of *North American Oil Consolidated v. Burnet*, 286 U.S. 417, 424, 52 S.Ct. 613, 615, 76 L.Ed. 1197 (1932) (Brandeis, J.), that "If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return [ = report as income], even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." The case is factually remote from the present one; the issue in *Burnet*, so far as relevant here, was whether the taxpayer had income before 1917, and the court held not, since the taxpayer neither had a right to the income till then nor received the income till then. Moreover, an essential element of the principle announced in *Burnet*—whether the money is received "under a claim of right"—is often a conclusion rather than a criterion; it is so in this case. The taxpayer never made a formal claim of right to the Rider R revenues beyond a right to hold them as (in effect) a fiduciary of the ratepayers; the government wants to impute such a claim of right to the taxpayer.

The government asks us to treat the words in *Burnet* "without restriction as to its disposition" as if they were alone enough to require that a receipt be treated as income. Clearly the lack of any restriction on disposition has some relevance, for the government concedes that if the Commission had ordered Illinois Power to place the Rider R revenues in a trust account for the benefit of the company's ratepayers, those revenues would no more be income to Illinois Power than the telephone excise tax, which the telephone companies collect and pay over to the government, is income to those companies. See, e.g., *Sohio Corp. v. Commissioner*, 163 F.2d 590 (D.C.Cir. 1947). But we cannot see what difference it makes whether the money is placed in a formal trust or is merely ordered held for the benefit of others, which is how we interpret the Commission's order. *Burnet* does not read on this question.

It is true that the Commission did not fix in advance the amount of interest that Illinois Power would have to pay when the Rider R revenues were refunded, but it made clear that they were not intended to enrich the company. This implied that the Commission would require full interest when the time for repayment came—and it did require it, at a rate equal to the rate of return which the Commission allows Illinois Power, so that Illinois Power did not profit from its custody of the money. If the Commission hadn't decided till 1979 to require interest, that belated decision could not be used to alter the characterization of the money as income back in 1976. But bear in mind that the Commission had ordered Illinois Power to make this rate increase strictly for the sake of conservation; had ordered it in effect to collect a tax, though one designed not to raise revenues but to alter the behavior of the taxpayers, like a pollution tax, or like mandatory container deposits, which are designed to induce container manufacturers to produce and consumers to return reusable bottles. Thus it was apparent back when the order was issued that the company would not be

able to profit from the higher rates. The company was to be a custodian, a tax collector, with no greater beneficial interest in the revenues collected than a bank has in the money deposited with it.

Although Illinois Power owned the revenues till ordered to credit them to its ratepayers, the same thing is true of a bank and its deposits. The bank is not a trustee, and the depositor is just an unsecured creditor. Thus the absence of a trust in this case is not decisive. And we cannot see what difference it makes that the refunds here were to a class of customers some or many members of which may have been different individuals from those who paid the higher rates ordered by the Commission. When a company collects sales tax as the government's agent, the money does not go to the customers who made the purchases on which the tax was levied. And the settlor and the trustee of a trust are not the same persons as the beneficiaries.

Where, unlike the case of a trustee or a collection agent or a borrower, the taxpayer's obligation to refund or rebate or otherwise repay money that he has received is contingent, the money is taxable as income to him. See, e.g., *Nordberg v. Commissioner*, 79 T.C. 655, 663–68 (1982), aff'd without opinion, 720 F.2d 658 (1st Cir.1983); Dubroff, *The Claim of Right Doctrine*, 40 Tax L.Rev. 729 (1985). In *Hirsch Improvement Co. v. Commissioner*, 143 F.2d 912 (2d Cir.1944), the taxpayer received rent under a lease that made it somewhat likely, though not certain, that he would later have to refund it; the rent was held to be income in the year received. Prepayment of money owed, as in the case of a rent "deposit" that is to be applied to the last month of the lease, is treated as income when received, if the purpose is to pay for goods or services in advance rather than to secure the lessee's good behavior (in which event it must be refunded unless he misbehaves). See *City Gas Co. v. Commissioner*, 689 F.2d 943 (11th Cir.1982), and cases cited there. There is nothing like that here; there is even less contingen-

cy than in the case of a lessee's security deposit, which when bona fide is, as just suggested, excluded from income. See *Clinton Hotel Realty Corp. v. Commissioner*, 128 F.2d 968 (5th Cir.1942). An agreement to repurchase, as in *LaSalle Cement Co. v. Commissioner*, 59 F.2d 361, 363 (7th Cir.1932), is distinguishable from a sale subject to a duty of refund or rebate: the buyer under such an agreement has no obligation to resell to the seller, and so the latter may well get to keep the full income from the original sale.

Neither can the government gain solace from cases like *United States v. Williams*, 395 F.2d 508 (5th Cir.1968), which hold that the substance of a transaction is more important than its form. A so-called "loan" was reclassified there as prepayment of rent, the court properly noting that among other things the "borrower" (lessor) had executed no promissory note. See *id.* at 511; see also *Van Wagoner v. United States*, 368 F.2d 95, 97–98 (5th Cir.1966). In *Consolidated-Hammer Dry Plate & Film Co. v. Commissioner*, 317 F.2d 829, 832–33 (7th Cir.1963), this court reversed the sequence, found that a partial payment was really in the nature of a loan, and held that the payment was not income to the taxpayer. But see *Boeing Co. v. United States*, 338 F.2d 342, 350 n. * (Ct.Cl.1964) (per curiam).

The underlying principle is that the taxpayer is allowed to exclude from his income money received under an unequivocal contractual, statutory, or regulatory duty to repay it, so that he really is just the custodian of the money. *Consolidated-Hammer* was such a case, as was another decision of ours, *Bates Motor Transportation Lines, Inc. v. Commissioner*, 200 F.2d 20 (7th Cir.1952), where the taxpayer had a contractual obligation to repay the money in question, and we held it was therefore not income. *Broadcast Measurement Bureau, Inc. v. Commissioner*, 16 T.C. 988, 996–1002 (1951), held that subscription fees collected under an agreement to use them to conduct a study and return any left-over money to the subscribers were not income, even though there was no formal trust agreement. See also the discussion in

Park Place, Inc. v. Commissioner, 57 T.C. 767, 778 (1972). *Max Sobel Wholesale Liquors v. Commissioner*, 630 F.2d 670, 671–72 (9th Cir.1980), and *Dixie Dairies Corp. v. Commissioner*, 74 T.C. 476, 492 (1980), hold that when goods are sold subject to a rebate in cash or kind, only the net receipts are taxable income to the seller. *United States v. Mississippi Chemical Co.*, 326 F.2d 569, 573 (5th Cir.1964), illustrates the application of this principle to patronage refunds by a co-op.

Last but not least is *Mutual Tel. Co. v. United States*, 204 F.2d 160 (9th Cir.1953) —a case indistinguishable from the present one. A public utility commission ordered a telephone company to increase its rates in order to curtail an unexpectedly heavy demand for telephone service; the commission's order "in effect directs appellant to retain custody of the moneys or its equivalent until further disposition is directed." *Id.* at 161. The moneys were not segregated or held in formal trust. See *id.* Yet the court held that they were not taxable income. See also *Sohio Corp. v. Commissioner, supra;* cf. *Natural Gas Pipeline Co. v. FPC*, 134 F.2d 263 (7th Cir.1942).

The general problem which the case law exemplifies is that for the sake of administrative simplicity the tax laws frequently treat a receipt that is part income and part not income as either all one or all the other; for an illustration of the same problem on the expense side of the tax ledger see *Moss v. Commissioner*, 758 F.2d 211 (7th Cir. 1985). The first issue discussed in this opinion was another illustration of how the tax laws frequently require a dichotomous solution to a continuous problem.

In a world without administrative costs the issue whether a receipt that may have to be repaid is income would be elided. The court would merely ask what the (risk-adjusted) present value of the receipt was, given the probability that it might have to be returned to the payor and the terms and conditions under which the recipient could use the money in the meantime, and the tax would be levied on that value. But this is not the method used; usually the court just asks how likely is repayment, and if the answer is, not very, the receipt is treated as income. Here the likelihood was too great to permit the government to treat the Rider R revenues as income.

Even if the analytically sounder but administratively less feasible method just suggested were used, the government would lose. For this is a case where the present value of the receipt to the taxpayer is not merely slight, but zero (or very close to it). Not only did Illinois Power know from the start that it would have to pay back the money; the Illinois Commerce Commission made clear from the start that the company would also have to turn over any interest earned on the money. Illinois Power could thus derive no benefit at all from having held the money. It was an unpaid collection agent, like an employer forced to collect his employees' social security taxes for the government. In contrast, Illinois Power would derive some net benefit from borrowed money (the receipt of which would clearly not be taxable), for it would borrow money only if the value to it of having the use of the money exceeded the interest cost. We reverse the Tax Court's assessment of a deficiency for Illinois Power's 1976 federal income tax.

AFFIRMED IN PART, REVERSED IN PART.