**IOWA SOUTHERN UTILITIES COMPANY, and Subsidiary Companies, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 503–83T.**

United States Claims Court.

March 13, 1987.

K. Martin Worthy, Washington, D.C., attorney of record, for plaintiffs. Joe Dixon Edge, Gregory K. Oyler and Hamel & Park, Washington, D.C., of counsel.

Allan C. Lewis, with whom was Asst. Atty. Gen. Roger M. Olsen, Washington, D.C., for defendant.

## OPINION

WIESE, Judge.

Plaintiff, a public utility, was permitted to add a surcharge to the cost of its electric service to defray the financing expenses associated with the construction of a new power plant. The regulatory order authorizing the surcharge provided that the amounts collected would be "refunded" to the utility's customers in the form of reduced rates during the thirty-year period following completion of the plant. The issue in the case—presented here through cross-motions for summary judgment—con-

cerns the proper tax treatment of these surcharges.

Plaintiff contends that the surcharges should be treated as borrowed funds, and hence, not includable in gross income; or, if the surcharge revenues are deemed to be income, that the rate reductions scheduled for the post-construction years should be treated as payments of a refund obligation, and hence, deductible as an accrued liability during the same years in which the surcharges were collected. Failing these arguments, plaintiff asserts that the surcharges should be treated as advance payments for electric service, includable as income only in the years following plant completion. The Government urges a narrower view: that the surcharge receipts should be treated as gross income during the years collected, with no offsetting deduction for any accrued refund liability.

Briefs have been filed, and argument has been heard. The court now grants defendant's motion.

### FACTS

Plaintiff, Iowa Southern Utility Company and its subsidiaries (collectively "Iowa Southern" or "the company"), is a public utility which supplies electric service to residential and commercial customers in southern and southeastern Iowa. The rates the company is permitted to charge are set by the Iowa State Commerce Commission ("the Commission"). The company uses the accrual method of accounting for reporting federal income taxes.

In 1976, Iowa Southern, together with two other utilities, began construction of a $350–million coal-fired power plant in Ottumwa, Iowa. During the same year, the company sought a rate increase from the Commission. One of the issues then before the Commission was plaintiff's request to include in its rate base the costs of construction work in progress, in lieu of capitalizing those costs and postponing their amortization until after the plant was put into operation. Approval of this request would have allowed the company the bene-

fit of a current return on its construction costs.

Subsequently, in a stipulation, plaintiff and the Commission agreed upon an alternative plan under which Iowa Southern would be permitted to impose a special surcharge on its electric utility service to cover the costs of financing the plant construction during the years 1978 through 1981, i.e., while the work was in progress. Then, after the plant went into operation in 1981, the amounts collected through the financing surcharge would be "refunded" without interest to customers over a thirty-year period in the form of a negative surcharge. Adoption of this plan was made contingent upon a ruling from the Internal Revenue Service ("IRS") that the surcharge would not result in additional income tax liability to the company.

The IRS declined to give its blessing. It ruled that the surcharge would result in taxable income to Iowa Southern during the years in which the surcharge was collected and that the refunds would simply result in reduced taxable income in the following thirty years. The Commission then issued an order adopting a revised stipulation, which made the surcharge plan effective irrespective of the IRS ruling.

The relevant portion of the revised stipulation provides as follows:

Beginning with April, 1978 billing, ISU [Iowa Southern Utilities] may service the cost of financing the construction of its share of the Ottumwa Generating Station by means of mandatory monthly surcharges which are to be unconditionally refunded to customers upon the commencement of commercial operation of the generation station in accordance with a tariff to be filed with the Commission. * * *.

Following approval of the stipulation, the Commission approved monthly tariff sheets for electric charges, including collection of the surcharges. The tariff sheets provide in pertinent part as follows:

The charges for electric service shall be increased to recover the financing charges associated with the Company's

portion of the construction cost of the Ottumwa Generating Station # 1 (OGS). The increased billing shall constitute a "customer surcharge", the total of which shall be refundable without interest over the life of OGS to the then existing customers. The life of OGS used for refunding purposes shall be the same as that used for book depreciation, this not to exceed 30 years.

The surcharges appeared on customers' bills in the form of a single per-unit cost adjustment, in which the financing surcharge was combined with two unrelated items—an energy cost adjustment and a purchased gas adjustment. The surcharges—and subsequent negative surcharges—were computed on the basis of kilowatt hours of electricity used by the individual utility customer. Nothing on the customer's bill identified the surcharge as anything other than a charge for the previous month's electric service.

Plaintiff collected a total of $12.3 million in surcharges from June 1978 to May 1981. The surcharge receipts were not segregated in a special account and were available for general corporate use. The Ottumwa plant was completed in May 1981, and rate reductions went into effect the following month, pursuant to a new tariff sheet approved by the Commission.

Plaintiff included surcharge revenue as gross receipts for purposes of charging state sales taxes on customers' bills. However, it did not include surcharge receipts as income on its consolidated federal income tax returns for the years 1978 through 1980. The IRS assessed a deficiency for those years. Under protest, plaintiff included surcharge receipts as income during 1981, reduced by the amount of money refunded in negative surcharges during that year. Plaintiff brought suit seeking a tax refund of about $5.6 million, plus interest.

## DISCUSSION

Gross income is defined as "all income from whatever source derived, including (but not limited to) * * * [c]ompensa-tion for services, including fees, commissions, and similar items". I.R.C. § 61(a)(1). The surcharges here fit squarely within this definition. The tariff sheets under which those charges were authorized state: "[t]he charges for electric service shall be increased" to recover construction financing costs. On their face, the tariff sheets establish that the surcharge receipts are compensation for services, and hence, taxable income.

Iowa Southern seeks to avoid this result by arguing that it collected the surcharges under an unconditional obligation to make refunds in future years. Because of this obligation, plaintiff argues, the surcharge revenue should be treated as a "loan" to the company from its customers, and thus excludable from gross income. Alternatively, plaintiff urges, the purported repayment liability should be treated as a deductible business expense (or cost of goods sold) which accrued at the same time the surcharges were collected. The court cannot endorse these arguments.

As to the contention that the surcharge was, in actuality, a loan, this characterization finds no support in the attendant facts. We note these points: First, as stated, the tariff sheets implementing the surcharge refer to it as an increase in the charges for electric service, not as a loan. Second, the company's monthly billing statements to its customers included the surcharge as a cost of electricity, not as a loan. Third, for purposes of the Iowa sales tax, the amount attributable to the surcharge was treated by plaintiff as compensation for the sale of electricity, not as a loan. Fourth, no customer was ever advised of a loan arrangement, much less agreed to one. Fifth, and finally, under the mechanics of the surcharge arrangement, the rate reductions that were to follow during the "repayment" years would benefit all of the company's customers without regard to whether they had paid a financing surcharge in the initial years.

On these facts, it is impossible to find any recognition, express or implied, of a promissory engagement between plaintiff

and its customers relating to the borrowing and the repaying of money. And without such, no loan argument can be sustained, for the Supreme Court has made clear that even an unconditional obligation to restore money does not by itself justify treatment of the money as borrowed funds for income tax purposes. *James v. United States*, 366 U.S. 213, 219, 81 S.Ct. 1052, 1058, 6 L.Ed.2d 246 (1961), *overturning Commissioner v. Wilcox*, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752 (1946).

Although the basic elements of a debtor-creditor relationship plainly are absent here, nonetheless plaintiff claims to find an alternative rationale in support of its position in the Seventh Circuit's recent decision in *Illinois Power Co. v. Commissioner*, 792 F.2d 683 (7th Cir.1986), *rev'g in part*, 83 T.C. 842 (1984).

In that case, an electric and gas utility had been directed by the state regulatory commission to collect a surcharge from a certain class of industrial customers—the so-called "interruptible" user—in order to discourage this particular group's consumption of natural gas. At the time of this directive—1976—the regulatory body made it clear that the purpose of the surcharge was to promote gas conservation, not to benefit the utility. The commission stated that it would decide at a later date exactly how the surcharge receipts would be applied. In the meantime, however, the utility enjoyed unrestricted use of the money and was not required to segregate it in a separate account. Later, in 1979, the commission ordered the utility to distribute—with interest—a portion of the surcharge revenues to general customers in the form of a credit on their monthly bills. *Id.* at 687–88.

In subsequent litigation in the Tax Court relating to the proper tax treatment of the surcharge revenues, the utility argued, among other grounds, that the portion of the surcharge which it had been ordered to redistribute should not be treated as taxable income in the years of receipt because

of the application of the trust fund doctrine. That is, the utility asserted that it had received the funds essentially as a trustee in that it had held them only for the benefit of others.

The Tax Court rejected this argument. It concluded that the funds at issue were not "impressed with a trust upon their receipt", 83 T.C. at 897–88 (citation omitted), because there was no arrangement or agreement between the utility and its customers respecting the company's receipt of the funds, nor was there any condition otherwise in place restricting the company's use of the funds.

The court of appeals reversed. What was controlling, in the appellate court's view, was not the absence of a formal trust arrangement or, for that matter, the absence of restrictions on the use of the monies (although the latter, it was acknowledged, had "some relevance"). 792 F.2d at 688. Rather, the significant point was the fact that at the time the surcharge was authorized, the state commission made clear that the revenues were not intended for the utility's benefit. That declaration of purpose, said the court of appeals, "implied that the Commission would require full interest when the time for repayment came". *Id.* at 688. And, in fact, when the utility was ordered to credit the bills of general customers, the amount distributed equaled the amount of the surcharge revenues, *plus interest.* Because the utility did not profit from holding the money, the court concluded, the company had acted as a mere custodian of the funds for the benefit of the general ratepayers. As the court put it, the utility was in essence "a tax collector, with no greater beneficial interest in the revenues collected than a bank has in the money deposited with it." *Id.* at 689.

■ In passing on the applicability of *Illinois Power* to the case at hand, it is enough to say that the decision basically rested on the proposition that one who derives no "readily realizable economic val-

ue" from the receipt of funds receives no income. *Rutkin v. United States*, 343 U.S. 130, 137, 72 S.Ct. 571, 575, 96 L.Ed. 833 (1952). The opposite is true, however, in situations where the taxpayers do not act as disinterested conduits, but "exercise control over the funds for their own benefit." 1 B. Bittker, *Federal Taxation of Income, Estates & Gifts* § 6.3.2 at 6–14 (1981). Thus, the same circuit that decided *Illinois Power* also concluded that where a utility receives a rebate from its suppliers under a Government order to pass the rebate along to its customers, it has no income; but where the utility takes and holds the rebate for its own benefit, it receives income. *National Gas Pipeline Co. v. Federal Power Commission*, 134 F.2d 263, 264 (7th Cir.1942).

This case falls squarely within that second category. Plaintiff enjoyed the unrestricted use of the surcharge revenues—and in fact spent them to defray construction financing costs. Moreover, at the time the surcharges were approved, the Iowa State Commerce Commission expressly stated that the amount to be "refunded" to customers would be equal to the surcharge revenues "without interest". Under those circumstances, plaintiff cannot be viewed as a mere custodian holding funds for the benefit of someone else.

Unlike the situation in *Illinois Power*, the purpose of the surcharge plan here was neither to encourage conservation nor to benefit one class of consumers at the expense of another class. Rather, the purpose was to benefit the utility by providing a more attractive means of financing construction of a new plant. There is no reason to treat plaintiff as not having received an economic benefit—and, hence, income—from the surcharges.

Indeed, *Illinois Power* expressed precisely the same thought. There the court noted in passing that if the regulatory commission had made no provision—express or implied—for repayment with interest at the time the surcharge was approved, there

would be no grounds for excluding the surcharge revenues from income in the year received. As the court stated, "[i]f the Commission hadn't decided till 1979 to require interest, that belated decision could not be used to alter the characterization of the money as income back in 1976." 792 F.2d at 688.

In this case, the Iowa regulatory commission deliberately decided *not* to include interest in the amount of the negative surcharges. It follows that Iowa Southern was not intended to be a passive conduit of the surcharges—in an economic sense or otherwise—but rather the active beneficiary of those revenues. The surcharges must therefore be treated as income in the years in which plaintiff enjoyed the right to collect them.

Plaintiff argues, however, that if it is held to have received income from the surcharges, then the company is simultaneously entitled to an offsetting deduction in like amount because of its obligation to credit negative surcharges to customers' bills in future years. Plaintiff contends that all the events necessary to fix the negative surcharges as a liability occurred at the time that the surcharges were collected, or at least at the time the new power plant went into operation. And thus, it is argued, accrual is warranted as a matter of law. In support of its position, plaintiff relies primarily on the recent decision in *United States v. Hughes Properties, Inc.*, — U.S. ——, 106 S.Ct. 2092, 90 L.Ed.2d 569 (1986), where the Supreme Court held that a slot machine jackpot accrues as a fixed liability—even though it has not yet been won—because the payout obligation is certain and only its timing is left to be decided by a future event.

Whether the all events test would be satisfied on the facts of this case is a question we do not reach. Plaintiff's argument founders on more fundamental ground: it erroneously characterizes as a deduction *from* income what is, in reality, a reduction *in* income.

 A deduction, for federal income tax purposes, involves a cost or expenditure that is incurred in the process of producing income from a trade or business. *See* I.R.C. § 162(a). We do not have that here. Granted, the language of the stipulation, and also that of the tariff sheets, speaks in terms of a "refund" of the surcharges. But the fact of the matter is that these documents set up no obligation to pay; they establish no liability. Rather, all that they accomplish is a declaration of regulatory policy: that rates shall be raised in certain years and then lowered in subsequent years to offset the increase. It suggests a confusion in thought to argue that the expected future reduction in the charges for electric service qualify as a cost, *i.e.*, a deduction, incurred in the process of producing the income generated through the allowed increase in charges. Perhaps in some broad economic sense there may be room for that sort of argument, but not in federal tax law. The negative surcharges represent a price change; not a liability. Accordingly, there existed no deductible expense to accrue.

 Finally, there is no merit in plaintiff's contention that the surcharge should be treated as an advance payment by customers for electric service over the thirty-year life of the new plant. For purposes of accrual accounting, an advance payment is defined as any amount received in a taxable year "pursuant to, and to be applied against, *an agreement* * * * [f]or the sale * * * in a future taxable year of goods". Treas.Reg. § 1.451–5(a)(1)(i) (1986) (emphasis added). In this case, there is no indication that any customer ever agreed to pay for future service when he paid his monthly bill. And there is certainly no indication that he ever agreed to pay for someone else's future service. All that can be said is that a customer's consumption of electricity gave rise to an implied in fact agreement to pay for that month's service at a rate set by Commission order. That, and that alone, is the service for which the customer paid when he paid his bill.

CONCLUSION

For the reasons stated, defendant's motion for summary judgment is granted.