650 A.2d 241

COMPTROLLER OF the TREASURY

v.

WASHINGTON GAS LIGHT COMPANY et al.

No. 26, Sept. Term, 1994.

Court of Appeals of Maryland.

Dec. 7, 1994.

John K. Barry, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, Gerald Langbaum, Asst. Atty. Gen., on brief), Annapolis, for appellant.

Karen B. Pancost (Ralph E. Fisher, on brief), Washington, DC, Cynthia Green–Warren, Asst. People's Counsel (Michael J. Travieso, People's Counsel, on brief) Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, BELL and RAKER, JJ., and JOHN F. McAULIFFE, Judge of the Court of Appeals (retired), Specially Assigned, J.

RODOWSKY, Judge.

This case involves the income taxation of a public utility that is under a regulatory duty to credit to certain customers a percentage of its net margin on sales to other customers. For the reasons set forth below, we shall hold that the credited amount is not income to the utility.

■ The appellee, Washington Gas Light Company (WGL), is a public service company, as defined in Maryland Code (1988), § 8–401 of the Tax General Article (TG).[1] WGL provides natural gas to residents of Montgomery, Prince George's, Charles, Calvert and St. Mary's Counties. As a public utility, WGL is subject to a Maryland franchise tax and to the corporate income tax. A two percent franchise tax is imposed on gross receipts of public service companies derived from business in Maryland. §§ 8–402 and 8–403. The corporate income tax is imposed at a rate of seven percent on Maryland taxable income. § 10–105. Gross receipts subject to the franchise tax are, in general, excluded in determining

---

1. Unless otherwise specified, all statutory references are to Md.Code (1988), Tax General Article.

the income tax liability of a utility, pursuant to the income tax structure described below.

Maryland corporate income tax is calculated on Maryland modified income. § 10–301. Maryland modified income is the corporation's federal taxable income as determined under the Internal Revenue Code, subject to certain Maryland adjustments. § 10–304. "To the extent included in federal taxable income," certain amounts "are subtracted from the federal taxable income of a corporation to determine Maryland modified income." § 10–307(a). The subtractions from federal income include "gross receipts, less related expenses, that are subject to the public service company franchise tax." § 10–307(e).

As a public service company, WGL is regulated by the Public Service Commission (the Commission). Md.Code (1957, 1991 Repl.Vol.), Art. 78, § 1 *et seq.* Before WGL can sell gas, its schedule of rates must have been duly filed and published. Art. 78, §§ 27(a), 28(a). From the standpoint of WGL's utility rates, this case involves two classes of customers—those whose service is anticipated to be uninterrupted (the firm customers) and those whose service is anticipated to be interrupted. Prior to 1984 "interruptible rates were determined much the same way as rates for other customer classes." *Re Maryland Natural Gas, A Div. of Washington Gas Light Co.,* 79 Md. PSC 298, 340, 1988 WL 391248 (1988) (Case No. 8119). Flexible, interruptible rates were authorized for WGL in *Re Washington Gas Light Co.,* 75 Md. PSC 436 (1984) (Case No. 7649). As part of the authorization for WGL to charge flexible, interruptible rates, the Commission directed WGL to pay to firm customers a percentage of its margin on sales to interruptibles. This payment is called the firm credit adjustment (FCA). *Id.* at 443.

Potomac Electric Power Company (PEPCO) is a flexible, interruptible rate customer of WGL. The assessment for an income tax deficiency against WGL that the Comptroller of the Treasury here seeks to sustain involves the amount of FCA paid by WGL to firm customers out of payments by

PEPCO to WGL for natural gas for the WGL tax years ending December 31, 1988, September 30, 1989, and September 30, 1990. It appears that PEPCO was the only flexible, interruptible rate customer of WGL for those years and that WGL's sales to PEPCO were made to the latter's facility at Chalk Point.

At issue here is the characterization of the FCA for income tax purposes. Resolution of the issue requires a further explanation of the FCA. In Commission Case No. 7649, WGL sought flexible pricing for its sales to interruptibles. WGL "claimed the existence of an unprecedented potential for the loss of load from interruptible customers capable of switching to alternate fuels." *Id.* at 442. Increasing natural gas prices, declining fuel oil prices, and more competitive electric prices influenced this potential. *Id.* at 442–43. WGL's application sought "the assignment to firm customers, through the commodity charge, of the fixed charges formerly recovered from interruptible customers in the commodity charge applicable to that class." 79 Md. PSC at '340. The Office of People's Counsel (OPC) and the Commission staff opposed this initial proposal because it would shift "cost recovery (other than purchased gas costs) from commodity to fixed, system charges." 75 Md. PSC at 455. The Commission rejected that proposal by WGL.

Thereafter all of the parties to Case No. 7649, including the OPC, presented a Joint Proposal that was given effect by the Commission. Part of the response to the problem of shifting fixed or nongas charges was to require WGL to pay the FCA to firm customers. A summary describing the Joint Proposal appears in Case No. 8119 as follows:

"[T]he parties sought the institution of flexible interruptible rates bounded by a floor and a ceiling. An increase in the commodity charges for firm customers of 1.25 cents per therm was stipulated, based on the uniform assignment of $4.642 million of interruptible non-gas costs to firm customers, with WGL assuming the risk of recovering the remain-

ing $3 million in non-gas costs from sales to interruptible customers under the new interruptible rate schedules.

"A formula was also proposed for the recovery of those non-gas costs. WGL could recoup its three million 'at risk' dollars through a sharing of the margin obtained from interruptible sales, on a 50/50 basis on the first $6 million of margins obtained from interruptible customers. The remaining $3 million in margins from the first $6 million recovered would be assigned to firm customer classes through a Firm Credit Adjustment ('FCA'). Thereafter, the margin would be shared by crediting the firm customer classes with 80 percent of margins received, with WGL retaining 20 percent. Under this formula, firm customers were compensated for the initial assignment of the $4.642 million of non-gas costs to them if WGL obtained just over $8 million in margins from interruptible customers."

79 Md. PSC at 340.

The percentage of margin over $6 million credited to firm customers was raised to 90% in 1988 in Case No. 8119. *Id.* at 341. The FCA is redetermined quarterly, based on figures for the preceding twelve months, and it is paid to firm customers monthly. The FCA paid to a particular customer is reflected on that customer's WGL bill as a dollar amount of credit determined by multiplying the FCA, converted into a factor per therm per month, by the number of therms used by the customer.

Because part of the margin is paid over by WGL to firm customers, only that part of the margin that WGL retained from the PEPCO sales was included in gross income by WGL on its federal and Maryland income tax returns for the years in question. This can be demonstrated by using the relevant numbers from WGL's federal income tax return for fiscal year 1990. Part of that return is a special schedule headed, "Detail of Gross Receipts." It reads as follows:

"Line

1  Operating Revenues Prior to FCA Adjustment to Firm Ratepayers from Chalk Point Sales ... 681,503,856.10

2  Total Chalk Point Sales ... 21,908,832.95

3  90% of Net Margins Applicable to Sale of Gas to Pepco Credited to Firm Ratepayers ... (1,093,655.00)

4  Total Operating Revenues ... 702,319,034.05

5  Revenues from Merchandising· & Jobbing ... 2,048,599.34

6  Gross Receipts per Federal Income Tax Return ... 704,367,633.39"

(Footnote omitted). On a "Statement of Consolidated Taxable Income" for WGL and subsidiaries that was included by WGL as part of its federal return, an element of total income for WGL was "Gross Receipts" reported at the same $704,367,-633.39. After deductions, WGL reported taxable income on its federal return of $85,560,487.50. Worksheets of the Maryland Income Tax Division auditor reflect that $85,560,487 was reported by WGL as its taxable income per federal return on line one of form 500, the Maryland corporate income tax return.[2]

WGL excluded the FCA from its gross income for the federal and Maryland returns in reliance on the "claim of right" doctrine recognized in *North Am. Oil Consol. v. Burnet,* 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197 (1932). There the Court stated that "[i]f a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to [report on his] return...." *Id.* at 424, 52 S.Ct. at 615. Conversely, reasons WGL, if the taxpayer has no claim of right to funds received, the funds are not income.

Following an audit of WGL, the Comptroller asserted that the part of the margin on PEPCO sales credited to firm customers was subject to Maryland income tax and assessed

---

2. WGL's Maryland tax returns for the years in question are not in evidence in this case.

WGL for a deficiency. In calculating the assessment, the auditor classified WGL's federal taxable income between utility income and nonutility income. Utility income represented gross receipts subject to the franchise tax on public service companies that is excluded from federal taxable income in arriving at Maryland modified income while nonutility income represented federal taxable income included in Maryland modified income. The auditor then deducted the amount of the FCA for the taxable year from utility income and added that amount to nonutility income. For example, for FY 1990 utility income was reduced by $1,093,655, the amount of the FCA for that year, and nonutility income was increased by $1,093,655. The effect of the adjustment was to reduce the amount of the "gross receipts subject to the public service company franchise tax" that is subtracted from federal taxable income and to increase the Maryland modified income upon which Maryland corporate income tax is paid.[3]

WGL appealed the Comptroller's assessment to the Maryland Tax Court which reversed the assessment. The Tax Court, in an oral opinion from the bench, considered determinative

> "the unusual and unique arrangement that spells out from the very beginning that ninety percent of this margin can never flow to the benefit of [WGL]. That it is mandated by

---

**3.** The State Department of Assessments and Taxation administers the Public Service Company Franchise Tax. TG §§ 8–404 and 1–101(g). In 1986 the Department had ruled that receipts from WGL's sales to PEPCO were not subject to the gross receipts tax because the gas sold to PEPCO was used by PEPCO to generate electricity and PEPCO's sales to its customers were subject to the gross receipts tax. The validity of the assessment against WGL for income taxes that is the subject of the case before us does not depend on this ruling by the Department. Although the FCA is part of the receipts derived by WGL from its sales to PEPCO, WGL pays no Maryland franchise tax on those receipts, and WGL does *not* contend that the FCA is excluded, as receipts subject to the franchise tax, in determining Maryland modified income.

The Maryland Income Tax law has been amended so that the statute now generally conforms to the Department ruling. *See* Md.Code (1988, 1994 Cum.Supp.), TG § 8–401(b)(3)(iii).

the agreement with the Public Service Commission that it must flow in a different direction."

The Comptroller sought judicial review by the Circuit Court for Anne Arundel County. That court affirmed the Maryland Tax Court. The circuit court concluded that the FCA "was for the benefit of firm customers" and that "the Tax Court was not erroneous in its finding that [WGL] simply acted as a conduit or fiduciary for purposes of crediting any monies due to [WGL's] firm customers."

The Comptroller then appealed to the Court of Special Appeals. This Court on its own motion issued the writ of certiorari prior to consideration of the matter by the Court of Special Appeals.

In making the assessment the Comptroller's Income Tax Division analyzed the FCA in the following fashion:

"The gross receipts received from sales to PEPCO's Chalk Point Plant are reflected in the computation of federal taxable income which is the starting point for determining Maryland taxable income. The fact that [WGL] must, according to its special arrangement, provide a credit to its customers equal to 90 percent of the profit is not relevant at this point in the determination of their Maryland taxable income. . . . The 90 percent credit must be considered separate and apart from the receipts derived from the sales of gas to PEPCO's Chalk Point Plant. This being the case, the only way in which the credit can be taken into account is if there is a subtraction modification provided under the Maryland law. Clearly, since there is no such subtraction modification, it cannot be taken into account."

As we have seen above, WGL did not in fact include the FCA in its gross income on its federal returns.

■ In this Court the Comptroller in essence contends that the claim of right doctrine does not apply to the facts presented here. Each side relies on a different federal court decision in an income tax case involving a public utility to support its position.

WGL relies on *Illinois Power Co. v. Commissioner of Internal Revenue*, 792 F.2d 683 (7th Cir.1986). There Illinois Power was ordered by the Illinois Commerce Commission, the regulatory agency, to raise its rates to certain customers in order to reduce the demand for electricity. The order clearly stated that Illinois Power would not be permitted to retain the additional revenues, referred to as Rider R revenues. The order, however, did not provide any directions as to how, when or to whom the funds would be distributed. Nor did the order fix in advance the interest to be paid when the Rider R revenues were disbursed, although it was clear that there would be an interest obligation. Illinois Power owned the Rider R funds until ordered to distribute them. Five years later, the agency decided to distribute the funds by means of a credit on the utility bills of all Illinois Power customers, together with interest at a rate equal to the rate of return that the agency allowed to Illinois Power. The United States Tax Court held that the receipts were income to Illinois Power when received. *Illinois Power Co. v. Commissioner of Internal Revenue*, 83 T.C. 842, 1984 WL 15636 (1984).

In reversing the decision of the Tax Court, the Seventh Circuit pointed out that the Rider R revenues were ordered to be collected for conservation purposes and that Illinois Power had no greater beneficial interest in the revenues than a bank has in its deposits. *Illinois Power*, 792 F.2d at 688–89. According to the court, the "underlying principle is that the taxpayer is allowed to exclude from his income money received under an unequivocal contractual, statutory, or regulatory duty to repay it, so that he really is just the custodian of the money." *Id.* at 689. The court summed up by emphasizing the following factors:

> "Not only did Illinois Power know from the start that it would have to pay back the money; the Illinois Commerce Commission made clear from the start that the company would also have to turn over any interest earned on the money. Illinois Power could thus derive no benefit at all from having held the money. It was an unpaid collection

agent, like an employer forced to collect his employees' social security taxes for the government."

*Id.* at 690.

On the other hand, the Comptroller relies on *Iowa Southern Utilities Co. v. United States,* 841 F.2d 1108 (Fed.Cir.1988). In order to pay the financing costs of constructing a power plant, Iowa Southern obtained authorization in the form of a stipulation and order from the Iowa State Commerce Commission to assess a special surcharge on electric service to customers. The surcharge would be assessed during the last three years of construction. After the plant began operating, the amount collected as surcharge would be refunded, "unconditionally" and with interest, over thirty years through a negative surcharge. The surcharge was implemented despite an Internal Revenue Service ruling that the surcharge would be income to Iowa Southern when collected, and that the negative surcharge would lower taxable income when applied. The utility paid tax under protest, sued for a refund in the United States Claims Court, and lost. *Iowa Southern Utilities Co. v. United States,* 11 Cl.Ct. 868 (1987).

The Federal Circuit affirmed, rejecting, *inter alia,* an argument that the surcharge was a loan. The court stated that the stipulation and order established no liability; "[r]ather, all that they accomplish is a declaration of regulatory policy: that rates shall be raised in certain years and then lowered in subsequent years to offset the increase." *Iowa Southern,* 841 F.2d at 1111. In distinguishing *Illinois Power,* the court in *Iowa Southern* pointed out that while Illinois Power received no benefit from the transaction, Iowa Southern benefitted by having the financing costs of the construction covered by the surcharge. *Id.* at 1112.

In *Commissioner of Internal Revenue v. Indianapolis Power & Light Co.,* 493 U.S. 203, 110 S.Ct. 589, 107 L.Ed.2d 591 (1990), the utility company, in order to insure payment, required and held deposits from its less creditworthy customers. If a customer later met the utility's credit standards, the customer could receive a refund of the deposit or have the

deposit applied to future utility bills. In its financial reporting the utility carried the deposits as liabilities. At issue was whether the funds were prepayments and, thus, income. The Court held that the utility company did not have complete dominion over the funds, as there was an express obligation to repay, and the repayment was controlled by the customer. The Court stated that "[i]n determining whether a taxpayer enjoys 'complete dominion' over a given sum, . . . [t]he key is whether the taxpayer has some guarantee that he will be allowed to keep the money." *Id.* at 210, 110 S.Ct. at 593. Although the utility realized some economic benefit from holding the deposits, it did not have sufficient control over the funds to constitute income to it. *Id.* at 214, 110 S.Ct. at 595–96.

Under the Maryland income tax system "[t]o the extent practicable, the Comptroller shall apply the administrative and judicial interpretations of the federal income tax law to the administration of the income tax laws of this State." § 10–107. The instant case is a stronger case for the taxpayer than *Illinois Power* because of the shorter time between collection and disbursement of the funds. Here, under no circumstances was WGL allowed to retain for itself any of the FCA portion of receipts from PEPCO, and WGL had no control over the Commission-ordered disposition of the FCA funds. WGL received payment on PEPCO sales with full knowledge of its duty continuously to credit the bills of firm customers with the FCA portion of those receipts. Similar to *Illinois Power,* WGL did not benefit from receipt of the FCA portion of the PEPCO receipts and did not have discretion or control over its disposition. The FCA portion of the receipts of WGL on sales to PEPCO is not income to WGL. Accordingly, the circuit court did not err in affirming the Maryland Tax Court.

*JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY THE COMPTROLLER OF THE TREASURY.*