**Paul H. VAN WAGONER and wife Muriel Van Wagoner and J. W. Walker and wife, Violet Walker, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 22890.**

United States Court of Appeals Fifth Circuit.

Nov. 3, 1966.

Donald G. Gay, Dallas, Tex., for appellants.

John B. Jones, Act. Asst. Atty. Gen., Dept. of Justice, Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Melvin M. Diggs, U. S. Atty., Dallas, Tex., Harry Baum, Michael K. Cavanaugh, Harry Marselli, Attys., Dept. of Justice, Washington, D. C., Richard M. Roberts, Acting Asst. Atty. Gen., for appellee. Melvin M. Diggs, U. S. Atty., of counsel.

Before RIVES, THORNBERRY and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge.

Plaintiffs sued to recover refunds of federal income taxes paid for the period

---

1959 through 1961. The case was submitted to the court on an agreed stipulation of facts. The trial judge decided against the plaintiffs and they have appealed from an adverse decision.

Taxpayers were partners in a managing general insurance agency with offices in Dallas, Texas. They kept their individual records and filed their federal income tax returns on a cash receipts and disbursements basis; the partnership used an accrual method. During the years involved the partnership was general agent for two insurance companies specializing in the management and sale of policies of physical damage property insurance on oil well drilling rigs and equipment. The partnership performed the underwriting, prepared policy forms and established premium rates, but the sole insurance risk was borne by the respective insurance companies. The business originated with local insurance subagents located in various states and the insureds were generally oil well drilling contractors. The policies were typed by the partnership's employees and signed by the partnership as agent for the insuring company and then forwarded to the producing agent for delivery to the insured. Under this arrangement the producing agent would collect the premiums from the insured and forward the proceeds to the partnership less the usual 15 per cent agent's commission. The partnership as general agent would then retain its usual 5 per cent commission, leaving a net premium of 80 per cent which it remitted to the insurance company. The partnership was responsible for the net premium due the insuring company and if it extended credit for more than eighty days it did so at its own risk. If policies were cancelled during the policy term, both the partnership as general agent and the producing agent were obligated to return commissions on unearned premiums previously collected. A majority of the policies written during the involved years were called "reporting form policies" on which premiums were due from the insured in monthly or sometimes quarterly installments. Such premiums could not be calculated until the insured made certain use reports required by the policy provisions. The premium rates varied with the amount of use of the insured rigs and the area in which they were being operated. This use information was required by the terms of the policy from the insured by written reports and the partnership would then bill the insured on the basis of the information reported. On the "reporting form policies" regular premiums were not paid in advance or at the inception of the monthly or quarterly period to which they applied but were paid after the end of such period.

On a large number of such "reporting form policies" and depending upon the prospective insured's credit rating, the insured was required at the discretion of the partnership to pay at the inception of the policy a sum called a "deposit premium," the amount of which was shown on the face of the policy and generally was 10 per cent of total estimated three-year premiums where premiums were paid monthly, and 20 per cent of estimated three-year premium costs where premiums were paid quarterly. These "deposit premiums" secured the performance by the insured of his policy obligations including submission of the required operating reports and payment of the periodic premium. Upon the expiration of the period the amount of the deposit premium would be credited to the insured's account and any excess over what he owed would either be refunded to him or, if the policies were renewed, he would be given credit on the new policy.

When the producing agent received the "deposit premium" he retained his usual 15 per cent commission thereof and remitted the balance to the partnership as general agent which then retained its usual 5 per cent commission and remitted the balance to the insuring company.

In prior fiscal years the partnership treated these 5 per cent retainages as taxable income in the year received, but on September 1, 1958, it changed its procedure and set up a "special commission reserve" account on its books and ceased

reporting such amounts as income. No request was made by the taxpayer to the Commissioner of Internal Revenue for permission to change this accounting procedure and the Commissioner did not therefore consent to the change. After establishment of this account, the amounts thereof were repaid to the respective insureds or their agents by cash or proper credit upon termination of the respective policies; or if the policies were renewed, the insureds were given proper credit.

The amounts which the partnership received as "deposit premiums" were under complete, free and unrestricted control of the taxpayers who were obligated to refund an equivalent amount if the insured complied with all the terms of the policy. Generally the taxpayers invested the 5 per cent retained out of such premiums in securities or other liquid assets and reported dividends or interest on such securities in the year received. The taxpayers were not obligated to and did not pay interest on the amounts they retained out of the "deposit premiums."

The issue before us is whether the 5 per cent amounts retained by taxpayers out of the "deposit premiums" constituted taxable income to the partnership in the year received. The district court sustained the Commissioner and held that the "deposit premiums" were advance payments of premiums and the 5 per cent commissions withheld by the partnership from them and over which taxpayers had complete and unrestricted control were properly taxable in the year they were received. The district court also held that the change in accounting procedure which was instituted in 1958 by the taxpayers in connection with these "deposit premiums" constituted a change in the method of accounting which required the Commissioner's consent and approval; otherwise, taxpayers would be required to adhere to the former method of recording these accounts. See Internal Revenue Code, 1954, § 446(a), Treasury Regulations on Income Tax, 1954 Code, § 1.446–1 (a) (1).

Taxpayers contend that the "deposit premiums" were security deposits required at the inception of the policy which varied in amount with the discretion of the general agent and were maintained as such until after the termination of the policy and until determination of the total premium; that premiums could not be calculated at the inception of the policy because they varied with the subsequent use of the insured oil rigs. Taxpayers also contend that the "deposit premiums" secured more than the payment of money because the general agent was obligated to return the "deposit premiums" to the insured if the insured performed its policy obligations. Taxpayers principal reliance is on this Court's holding in Clinton Hotel Realty Corp. v. Com'r of Int. Rev., 5 Cir., 1942, 128 F.2d 968. In *Clinton* taxpayer leased a hotel for a term of ten years and paid one tenth of the total rental upon execution of the lease as an advance payment to be credited to the rent for the last year of the term. The advance payment also secured performance by the lessee of all terms and conditions in the lease and also any damage which lessor might sustain by reason of any act of lessee. This Court held that the advance payment was not rent paid in advance and therefore not taxable in the year received. The Court said that it was paid and received as security for the performance of covenants with no present right or claim of full ownership in lessor although it was expected finally to be applied in payment of the last year's rent if nothing happened to prevent it. In *Clinton* the lessor was obligated to pay $1,000 per year as interest on the deposit, and we said there that lessor's accountability for interest as well as the principal emphasized the character of the deposit as not being a prepayment of rent. We distinguished *Clinton* on the facts in our subsequent decision in Astor Holding Co. v. Commissioner of Internal Revenue, 5 Cir., 1943, 135 F.2d 47, 146 A.L.R. 993, and pointed out that one of the significant features of *Clinton* was that the advance payment

was "always referred to as a 'security' or a 'deposit'" and it was "obvious that there were many things to which it might become applicable besides the tenth year's rent." In *Astor* we held that part payment of the tenth year's rent at the beginning of the ten-year lease was a prepayment of rent and taxable to the lessor when received. We pointed out significantly that no interest was required to be paid by lessor to lessee which was different from *Clinton* where lessor was obligated to pay annual interest on the deposit.

The facts in the present case are not the same as *Clinton*; they more nearly resemble *Astor*. Here, taxpayers had the free and unrestricted use of the 5 per cent commissions retained from the "deposit premium" and paid no interest to the insured on such deposit.[1]

We agree with the district court that under the circumstances here the "deposit premium" is simply an advance premium and stands in place of payment of a regular premium at the inception of the policy. The percentage retained by taxpayers was the same as their agreed commission on regular premiums. Since taxpayers pay no interest on the 5 per cent commission retained by them on the "deposit premiums" and have complete and unrestricted control thereof, we believe the Commissioner was right and taxpayers should have included these commissions in income in the year they were received. See North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L. Ed. 1197 (1932); C. I. R. v. Gaddy, 5 Cir., 1965, 344 F.2d 460.

We do not reach the question of the propriety of taxpayers changing the method of treatment of their books of these "deposit premiums" beginning with the fiscal year on September 1, 1958, for a determination thereof is not necessary to our decision.

Affirmed.

---

1. See also Zaconick v. McKee, 5 Cir., 1962, 310 F.2d 12.