INDIANAPOLIS POWER & LIGHT COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 925-82.          Filed April 20, 1987.

*Larry J. Stroble, Lester M. Ponder,* and *Kenneth H. Inskeep,* for the petitioner.*

*Rodney J. Bartlett,* for the respondent.

SIMPSON, *Judge*: The Commissioner determined the following deficiencies in the petitioner's Federal income taxes: $134,073 for 1974, $553,254 for 1975, $174,668 for 1976, and $18,446 for 1977. After concessions by the parties, the only issue for decision is whether, in the circumstances of this case, customer deposits received by a public utility are includable in income upon receipt as advance payments.

### FINDINGS OF FACT

To the credit of both parties, many of the facts have been stipulated, and those facts are so found.

The petitioner, Indianapolis Power & Light Co., maintained its principal offices in Indianapolis, Indiana, at the time its petition in this case was filed. The petitioner filed its Federal income tax returns for the years 1974, 1975, 1976, and 1977 with the District Director of Internal Revenue, Indianapolis, Indiana.

The petitioner is an operating public utility which was incorporated under the laws of the State of Indiana on October 27, 1926. Since the date of its incorporation, the petitioner has been primarily engaged in generating, transmitting, distributing, and selling electrical energy in Indianapolis and in neighboring areas within the State of Indiana. It also produces, distributes, and sells steam within a limited area of Indianapolis.

As an Indiana public utility, the petitioner has always been subject to regulation by the Public Service Commission of Indiana (PSCI), which has promulgated Rules and Regulations of Service for Electrical Utilities in Indiana (the rules of service). The rules of service include, among other things, a rule concerning customer deposits collected by electrical utilities in Indiana. Ind. Admin. Rules and Regs. tit. 8, r. (8-1-2-4)-A42 (Burns Supp. 1978). Such rule was amended by the PSCI on March 10, 1976. The amendments

*Brief amicus curiae was filed by Jerome B. Libin and Bradley M. Seltzer as counsel for the Divested Bell Telephone Co. Subsidiaries and by Lawrence H. Cohen as counsel for American Telephone & Telegraph Co.

primarily affected the policies for deposits collected from residential customers and not the policies for deposits from commercial customers.

As part of its customary method of conducting business during the years in issue, the petitioner required deposits from certain of its commercial and residential customers. Such deposits were intended to insure the payment of such customers' utility bills. The charge for electrical service was usually the largest item on a customer's utility bill; however, such a bill could also contain charges for disconnection, for reconnection, for late payments, for returned checks, and for meter tampering. Approximately 95 percent of the petitioner's customers never had to make such a deposit. Commercial customers often made different arrangements, including the submission of letters of credit or the pledge of assets.

While the collection of customer deposits from the petitioner's residential customers was not normally a condition for obtaining or continuing service, a deposit would occasionally be a condition for providing service to a nonresidential customer. For example, if the customer requesting service was a transient merchant who was previously a delinquent customer, the petitioner might require a security deposit prior to connection of service. The fact that the petitioner received a customer's deposit did not create an obligation on the part of the petitioner to provide service to the customer.

Under the rules of service during the years at issue, the petitioner was required to issue a receipt to every customer who was required to make a security deposit. Such receipt stated that the deposit was to "insure prompt payment for electric service, steam service, or both" and that such deposit would be refunded "after Service has been disconnected and all bills due have been paid."

Prior to the amendments of the rules of service, the petitioner made the determination that a customer deposit was required on a case-by-case basis. The determination was based on a creditworthiness analysis made by the petitioner, but no fixed or prescribed formula was followed in making such determination. The amount of such deposit was ordinarily twice the customer's estimated monthly bill, and

the petitioner was required to pay interest at the rate of 3 percent per year on every deposit held at least 6 months. Accumulated interest was payable upon return of the deposit or annually upon demand in writing by the customer.[1]

Prior to the amendments of the rules of service, the petitioner refunded customer deposits prior to termination of service if the customer requested a refund and met the petitioner's creditworthiness standards. Such a refund was usually made in cash or by check, but was sometimes made by a credit to the customer's utility bill. The manner in which such a refund was made was usually determined by the customer; the petitioner asked the customer how he wanted the security deposit refunded. Upon termination of service, the petitioner refunded customer deposits by cash or check, if the customer requested it and paid his final bill. The petitioner refunded customer deposits by a credit to the customer's final bill when requested to do so by the customer, or when the customer had no preference as to the manner of refund and there was an unpaid balance in the customer's account; any surplus was returned to the customer by cash or check.

After the amendments of the rules of service, the petitioner was required to determine the creditworthiness of each residential applicant or existing residential customer, and customer deposits could be required only of those new customers who failed the creditworthiness test supplied by PSCI or those existing customers who had a history of late payments. The amount of such deposits could not exceed one-sixth of the annual billings of the customer, and deposits held more than 12 months earned interest at the rate of 6 percent per year. If a deposit was greater than $70, a residential customer was entitled to pay such deposit in equal installments over a period of no less than 8 weeks, with service starting upon receipt of the first installment. Commercial customers continued to be evaluated for creditworthiness on a case-by-case basis.

The amended rules of service required the petitioner to refund any residential customer deposit "upon satisfactory

---

[1] The phrase "customer deposit" will be used to include the initial deposit and any accumulated, and unpaid, interest.

payment by the customer for a period of either nine successive months or ten out of any twelve consecutive months (provided that the customer did not make late payments for any two consecutive months), or upon the customer demonstrating his creditworthiness by any other means." After the amendments of the rules of service, the petitioner automatically refunded residential customer deposits prior to termination of service if the customer satisfied the new creditworthiness criteria. Such a refund was made in cash or by check, or it was made as a credit to the customer's bill, if the customer specifically asked for that treatment. Customers were informed of their rights regarding such refunds in a pamphlet the petitioner was required to provide to all of its customers.

When a customer requested termination of service after the amendments of the rules of service, the petitioner usually applied the deposit as a credit to the customer's final bill. However, upon specific request from the customer, the petitioner had to refund directly the deposit within 15 days after payment of the final bill by the customer. In the event of an involuntary termination of service, the customer deposit was used by the petitioner to cover any unpaid balance of the customer's account, and any surplus was returned to the customer. In general, an involuntary termination of service occurred about 90 days after a customer bill was sent and no payment had been received from the customer for charges included on such bill or a subsequent bill.

For each of the years in issue, the petitioner reported its income by use of the accrual method of accounting, and for financial, regulatory, and tax-reporting purposes, the petitioner always treated the customer deposits as current liabilities and not as gross income. Customer deposits were not physically segregated from the petitioner's general funds and were subject to the petitioner's unfettered use and control. However, the petitioner always recognized the customer's right to a refund of his deposit until and unless the customer failed to pay his bill and service was disconnected; it never intended the customer deposits to represent advance payments for electric or steam service.

The rules of service required the petitioner to treat customer deposits as current liabilities in maintaining its books and records and preparing its reports for regulatory accounting purposes. Ind. Admin. Rules and Regs. tit. 8, r. (8-1-2-10)-C11 (Burns Supp. 1978). Such treatment of customer deposits was in accordance with generally accepted accounting principles and clearly reflects income for financial accounting purposes. Consequently, the petitioner's method of accounting for customer deposits has been accepted and never questioned by its independent accountants.

Under State law, unclaimed customer deposits escheated to the State of Indiana after 7 years. Ind. Code Ann. sec. 32-9-1-6 (Burns Supp. 1986). The total amount of customer deposits that escheated to the State from 1974 through 1977 was not more than $9,323.79.

The balance in the petitioner's customer deposit account was $546,793 on December 31, 1954,[2] $999,264.40 on December 31, 1974, $1,078,460.52 on December 31, 1975, $908,972.05 on December 31, 1976, and $883,027.54 on December 31, 1977. Some refunds were made in cash; those were offset against cash collections, and no records were kept of them. In the case of other refunds, some were refunded wholly by check, some wholly by crediting them against bills, and others by check in part and credit in part. The following table sets forth the amounts of total refunds for each year and the percentages refunded wholly by check, partially by check, and by credit:

|  | 1974 | 1975 | 1976 | 1977 |
|---|---|---|---|---|
| Total dollar amount refunded | $257,855.30 | $291,858.99 | $389,412.53 | $258,502.27 |
| Percentage refunded: |  |  |  |  |
| Wholly by check | 15.6% | 13.6% | 12.9% | 14.8% |
| Partially by check | 26.7 | 23.8 | 18.1 | 27.5 |
| Credit against bill | 57.7 | 62.6 | 69.0 | 57.7 |

[2]The parties stipulated that such amount was the balance on Dec. 31, 1954, and it was represented as such by both parties in their briefs. However, such amount was listed as "Pre-1954 customer deposits" in the notice of deficiency. In the petition and amended petition, it was also assumed to be the balance on Dec. 31, 1953, and it was used as such to calculate the additions to income arising from customer deposits. Resolution of any inconsistency is not required because both parties agree that $546,793 is the base from which customer deposit income adjustments were calculated.

In his notice of deficiency, the Commissioner determined, among other adjustments, that the petitioner was required to include in income the balance of customer deposits outstanding as of December 31, 1975, less deposits attributable to the period prior to 1954.[3] He also determined that the increase or decrease in the amount of the customer deposits on hand at the end of 1976 and 1977 represented an increase or decrease in the petitioner's income for each year, as the case may be. All other adjustments proposed in the notice of deficiency have been resolved by the parties.

OPINION

The only issue for decision is whether the customer deposits received by the petitioner were includable in income upon receipt as advance payments.

Section 61(a) of the Internal Revenue Code of 1954[4] defines gross income as all income from whatever source derived, including compensation for services and gross income derived from business. Moreover, section 451(a) and section 1.451-1(a), Income Tax Regs., state the general rule that any item of gross income shall be included in gross income for the year in which it is received by the taxpayer unless, under an acceptable accounting method, it may be properly accounted for in some other period. Advance payments of income are income in the year received. *Schlude v. Commissioner*, 372 U.S. 128 (1963); *American Automobile Association v. United States*, 367 U.S. 687 (1961); *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180 (1957). However, so-called deposits received by a taxpayer have, on occasion, been held not to be includable in gross income on receipt. E.g., *Mantell v. Commissioner*, 17 T.C. 1143 (1952). The courts have differed over the criteria to be used in distinguishing deposits from advance payments.

In *City Gas Co. of Florida v. Commissioner*, 74 T.C. 386 (1980) (*City Gas I*), the taxpayers, one regulated public utility and two nonregulated companies, were engaged in the business of selling gas to both residential and commer-

---

[3]See note 2 *supra*.

[4]All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

cial customers. The companies required all new customers to make deposits which were to be refunded or credited to the customer's account, at the company's choice, upon termination of service, or upon the company's prior election. Each of the companies reported the deposits as current liabilities, and the regulated company paid interest on the deposits. The deposits were generally credited against a customer's final bill and any balance was refunded by check. Any deposit that was not refunded to a customer within 15 years after termination of service escheated to the State. We stated the rules for distinguishing deposits and advance payments to be:

> Advance payments to which a taxpayer-recipient has a present right, and over which he has unrestricted control, are income upon receipt, even though they are refundable under certain circumstances. *Hagen Advertising Displays, Inc. v. Commissioner*, 407 F.2d 1105, 1107 (6th Cir. 1969), affg. 47 T.C. 139 (1966) (payments for advertising signs); *Van Wagoner v. United States*, 368 F.2d 95, 97-98 (5th Cir. 1966) (5-percent commissions on "deposit premiums" received by insurance agency partnership); *BJR Corp. v. Commissioner*, 67 T.C. 111, 121-123 (1976) (advance rents for use of mobile homes). If, on the other hand, an amount is deposited with a taxpayer as a security payment which is to be returned, it is not income, although the taxpayer has temporary use of the money. *Mantell v. Commissioner*, 17 T.C. 1143, 1145, 1148 (1952) (security deposit for lessees' performance of numerous lease covenants). See *Warren Service Corp. v. Commissioner*, 110 F.2d 723, 724 (2d Cir. 1940), affg. on this ground 39 B.T.A. 856 (1939). * * * [74 T.C. at 391.]

We analyzed all of the surrounding facts and circumstances and determined that the amounts in issue were received as security deposits subject to refund and, therefore, did not constitute income. The rationale for this conclusion was:

> Thus, although petitioners had temporary use of the customer deposits from the time of receipt, the deposited amounts were not advance payments for service but rather security to assure that the customer would pay all bills upon termination of the service. At all times, the deposits were treated as liabilities which petitioners owed to their customers subject to the deposit agreements. Those liabilities could be discharged only by applying the deposited amounts against unpaid bills for gas service and a variety of charges or by refunding them to the customers. Accordingly, we do not think any of the amounts at issue constituted income to petitioners when the deposits were received.

*       *       *       *       *       *       *

In contrast, the full amount of a deposit received by one of petitioners was, unconditionally, subject to refund to the customer. If the refund was not effected, the amount would ultimately escheat to the State. Although the total deposit might be applied against amounts owed a petitioner upon customer termination of his account, or at petitioners' prior election, the right of petitioners to any part or all of the deposit was not fixed and could not be determined when the deposit was made. Indeed, unlike a tenant under a lease, a gas customer did not contract for services for any stated period or periods but could terminate service at any time. Petitioners became entitled to apply all or part of the deposited amounts only if a customer otherwise failed to pay all charges due at the termination of service.

[74 T.C. at 393-394; fn. ref. omitted.]

In *City Gas Co. of Florida v. Commissioner*, 689 F.2d 943 (11th Cir. 1982) (*City Gas II*), the Court of Appeals for the 11th Circuit reversed and remanded the case. The Court of Appeals noted that a payment for a customer deposit to a utility company often serves mixed purposes; "it may serve both as security for property or performance of nonincome-producing covenants and also as a prepayment of bills, rent, or other charges for goods and services." 689 F.2d at 946. The Court of Appeals held that if the primary purpose of a customer deposit is to act as a prepayment for goods and services, then the amount of the deposit is includable in income upon receipt; if the primary purpose of the deposit is to secure performance of non-income-producing covenants or to secure against damage to property, then the amount of the deposit is not includable in income upon receipt. In footnote 7, the Court of Appeals recognized the importance of taxpayer control over customer deposits in determining whether or not such deposits are income upon receipt when it stated:

If on remand the Tax Court concludes that the primary intent was that the sums at issue be applied to discharge income items on the final bill (e.g., charges for gas, turn-on and turn-off and other service charges), the fact that the sums were labeled as "deposits to secure payment" cannot by itself preclude a finding that the sums were intended as prepayments. Although several courts have mentioned the "security" label as one factor, * * * we have found no case which would support a finding for the taxpayer where sums labeled as a "deposit" or "security" were subject to the unrestricted control of a taxpayer with a present right thereto and were intended to be applied against income items. The case law requiring a finding for the Commissioner under such circumstances, * * * is based, we think, upon the unarticulated rationale that under

such circumstances the sums are in substance prepayments. * * * We express no opinion with respect to the substance of payments under other circumstances, e.g., where sums intended to secure payment of future income items are deposited in escrow and taxpayer must foreclose to assert its security interest. * * * [689 F.2d at 948; citations omitted.]

Because the Tax Court had not applied this primary purpose test, the Court of Appeals remanded the case for further proceedings.

On remand, in *City Gas Co. of Florida v. Commissioner*, T.C. Memo. 1984-44 (*City Gas III*), this Court stated that, under the test adopted by the Court of Appeals, "deposits must be categorized either as prepayments for goods and services on the one hand, or as security for the performance of nonincome-producing covenants on the other. The Eleventh Circuit, as we understand it, did not admit of the possibility of other categories." T.C. Memo. 1984-44, 47 T.C.M. 971 at 973; 53 P-H Memo T.C. par. 84,044, at 84-163; fn. ref. omitted. We concluded that the primary purpose of the customer deposits was to act as a prepayment for gas consumed, and thus, the amount of the deposits was includable in income.

As might be expected, the Commissioner requests that we adopt the reasoning set forth in *City Gas II* in resolving the case at hand and argues that the primary purpose test set forth in *City Gas II* "sets forth a logical, predictable rule of consistency" and that "determining whether the deposits secured the payment of future income or non-income producing covenants is consistent with accepted precedent." He cites *Van Wagoner v. United States*, 368 F.2d 95 (5th Cir. 1966); *August v. Commissioner*, 17 T.C. 1165 (1952); *Gilken Corp. v. Commissioner*, 10 T.C. 445 (1948), affd. 176 F.2d 141 (6th Cir. 1949); and *J. & E. Enterprises, Inc. v. Commissioner*, T.C. Memo. 1967-191, as supporting the proposition that security deposits that secure future income are taxable upon receipt by the taxpayer. On the other hand, the petitioner believes that our opinion in *City Gas I* reflects judicial wisdom and urges us to continue to follow that precedent.

In *Van Wagoner v. United States, supra*, certain purchasers of insurance were required to pay "deposit premiums" at the inception of their insurance policies, and the taxpay-

ers, partners in an insurance agency, retained 5 percent of such deposit premiums. The taxpayers also retained as their commission 5 percent of the total premiums paid by the insureds over the life of the policy. The amounts received as deposit premiums "were under complete, free and unrestricted control of the taxpayers who were obligated to refund an equivalent amount if the insured complied with all the terms of the policy." 368 F.2d at 97. The taxpayers invested their shares of the deposit premiums but paid no interest to the insureds for the use of such funds. At the expiration of the policy term, the amount of the deposit premium was credited to an insured's account and any excess was refunded to him, or if the policy was renewed, he was given a credit on the premium for the new policy. The Court of Appeals agreed with the District Court that the deposit premiums were advance premiums, paid in place of a regular premium at the inception of each policy. The court noted that the taxpayers retained the same percentage from the deposit premiums as they did from total premium payments, that the taxpayers had complete and unrestricted control over the deposit premiums, and that they paid no interest on the deposits.

In *August v. Commissioner, supra,* the taxpayers were partners in a partnership which entered into two leases with the lessee. In the first lease, the term was from May 1945 through April 1950, for a total rent of $140,000, which included $28,000 to be paid to the taxpayers prior to the beginning of the lease term. The lessee was to pay $28,000 a year in rent for the first 4 years of the lease and no rent during the last year of the lease. In addition, the lease called for a "security payment" of $4,000 as security for the lessee's performance of the terms of the lease. In December 1945, the second lease was executed. Such lease was a renegotiation of the first lease, designed to provide tax benefits to the taxpayers, and was for a term from December 1945 through May 1950. Such lease called for a $32,000 security payment: $28,000 at the time of execution and $4,000 in 1949. The rent payment terms were the same as those set forth in the first lease, except that during the last year of the lease, $28,000 in rent was to be paid in 10 payments, and 6 days after each such payment, a check for

the same amount as such payment was to be paid to the lessee by the taxpayers. Such payments to the lessee were alleged to be a return of the $28,000 that he paid at the time of execution. In fact, during 1950, the lessee and the taxpayers met several times and exchanged checks for identical amounts. This Court concluded that the amount of $28,000 was an advance rental payment and, therefore, includable in the taxpayer's income for 1945. In arriving at this conclusion, we stated that the first lease expressed the intent of the parties that the $28,000 payment was not a bona fide security deposit and that the exchange of checks in 1950 had the practical effect of applying the $28,000 paid in 1945 toward the rent due for the last year of the lease.

In *Gilken Corp. v. Commissioner, supra,* the lessee of an apartment hotel paid the taxpayer certain amounts of money described as being security for the lessee's performance of lease obligations. Under the lease, and an amendment thereto, if the lessee faithfully performed the conditions of the lease, such security was to be applied to the last 5 months' rent of the lease, or if the lessee desired to exercise his purchase option, such security was to be credited to the purchase price. No interest was to be paid on the security deposit. We concluded, notwithstanding the option price credit provision, that the security payments were advance payments of rent, taxable upon receipt. We found that the money was subject to the taxpayer's unrestrained control and that the "primary purpose" of the payments was advance payment of rent.

In *J. & E. Enterprises, Inc. v. Commissioner, supra,* the taxpayer, as lessor, entered into two leases, each of which required a "security deposit." At the taxpayer's option, the deposits could be returned to the lessee, or applied to the rent payable during the last year of the lease. In addition, the taxpayer was not required to pay interest on the deposits or to segregate the deposit funds. In stating the relevant law, we said:

If, on the other hand, a sum is deposited to secure the lessee's performance under a lease, and is to be returned at the expiration thereof, it is not taxable income even though the fund is deposited with the lessor instead of in escrow and the lessor has temporary use of the money. * * * In this situation the acknowledged liability of the lessor to

account for the deposited sum on the lessee's performance of the lease covenants prevents the sum from being taxable in the year of receipt. * * *

The question of which rule is applicable must be resolved by reference to the intention and conduct of the parties as ascertained from the lease agreement and the related circumstances. * * *

[T.C. Memo. 1967-191, 26 T.C.M. 944, at 946, 36 P-H Memo T.C. par. 67,191 at 67-1033; citations omitted.]

We concluded that the security deposits were includable in income in the year received by the taxpayer because such deposits were under the exclusive and unfettered control of the taxpayer and because the circumstances under which the deposited sums might be returned to the lessee were within the exclusive control of the taxpayer.

After reviewing these cases, we conclude that they do not support the rule articulated by the 11th Circuit which is urged upon us by the Commissioner. In these cases, the courts looked at the facts and circumstances surrounding the deposit to determine whether or not the primary purpose of the deposit was to be an advance payment. Of particular importance in these cases was whether the taxpayer had control over the deposit during the term of the lease and upon its expiration, and whether interest was paid on the amount deposited. See *City Gas I*, 74 T.C. at 394-395. Where the taxpayer has virtually unrestricted control over the amount deposited and does not pay interest on such amount, the amount has been considered an advance payment of income. See *Hirsch Improvement Co. v. Commissioner*, 143 F.2d 912 (2d Cir. 1944); *Astor Holding Co. v. Commissioner*, 135 F.2d 47 (5th Cir. 1943).

In our judgment, we should continue to examine all of the facts and circumstances surrounding a deposit to evaluate the rights retained by the depositor and the rights acquired by the holder of the deposit. In the present case, it is very significant that most customers were not required to make deposits. In the *City Gas* cases, all new customers were required to make the deposits, and in the other cases relied on by the Commissioner, the lessees or other purchasers of services were generally all required to make deposits. If a deposit is intended as a means of obtaining an advance payment of income, it is apt to be required of all partici-pants; the fact that this petitioner required only 5 percent

of its customers to make deposits is highly persuasive evidence that the deposits were not intended as advance payments. In addition, the fact that creditworthiness was the criterion used in determining such customers, indicates that the deposits were not intended as advance payments.

Moreover, in the present case, the depositor—the customer—had the right to control the ultimate disposition of the deposit. Prior to the 1976 amendments of the rules of service, a customer could secure a refund of his deposit by requesting it, if he then met the petitioner's creditworthiness standards. After those amendments of the rules of service, the standards for determining creditworthiness were made explicit, and if a customer paid his bills when due, his deposit was automatically refunded to him in a year or so. Only those customers who did not pay their bills were unable to secure a refund of their deposits. In fact, it was more convenient for the customer and the petitioner to credit a refund against a bill, and therefore, many of those customers who were entitled to a refund of their deposits elected to have the deposits credited against their bills. The petitioner took reasonable steps to inform the customers of their rights to the deposits, and the fact that between 31 and 42 percent of the dollar amount of deposits refunded annually were by check shows that they were aware of their rights to a refund by cash or check.

The petitioner's rights in the ultimate disposition of the deposits were minimal. Only when a customer failed to pay his bills did the petitioner have a right to decide how the deposits were to be used; only then could the petitioner decide that the deposits were to be used to pay for electricity or services. Thus, in general, the deposits that were collected by the petitioner were held as security for the customer's payment of his bills; only when those bills were not paid did the deposits become payments for electric or steam service. In addition, the petitioner did not benefit from the deposits that were unclaimed by the customer or not credited to bills; the unclaimed deposits escheated to the State after 7 years.

Finally, the petitioner consistently treated the deposits as belonging to the customers. When a customer made a deposit, he was given a receipt stating that the deposit was

to "insure prompt payment for electric service, steam service, or both" and that such deposit would be refunded "after Service has been disconnected and all bills due have been paid." Also, the customer received interest on his deposits—at the rate of 3 percent per annum before the amendments of the rules of service in 1976 on deposits held at least 6 months, and 6 percent per annum thereafter on deposits held more than 12 months. In accounting for the deposits, the petitioner treated them as current liabilities. Such treatment was required by the rules of service. In paying interest on the deposits and in the accounting treatment of them, the deposits were treated like loans obtained by the petitioner.[5] Under the circumstances, we are convinced that the deposits were not advance payments of income but were temporarily held by the petitioner to secure payment of the bills and were not therefore includable in gross income.[6]

Each of the parties also argues that its position is supported by the *Illinois Power* cases. In *Illinois Power Co. v. Commissioner*, 83 T.C. 842 (1984), the Illinois Commerce Commission (ICC), which regulated the taxpayer's rates, created in 1974 a new gas rate classification, which had the effect of raising rates for certain commercial customers. The principal purpose of the new rate classification was to induce such customers to convert to an alternative fuel. The ICC made clear that this was its purpose. The ICC ordered that some of the revenue received by the taxpayer as a result of such rate classification be placed in a special fund and stated that the taxpayer would not be able to keep the money that was placed in such fund. But, it did not specify

---

[5]Cf. *Iowa Southern Utilities Co. v. United States*, 11 Cl. Ct. 868 (1987), wherein surcharge revenue to the taxpayer, an electric company, was found not to constitute a "loan" from its customers. The surcharge was intended to finance the construction of a power plant. After the power plant went into operation, the amount collected by the surcharge was to be refunded to customers over a period not to exceed 30 years, in the form of a negative surcharge. The court found that the surcharge was treated as a charge for electricity for customer billing and State sales tax purposes, that no customer was ever advised of the loan arrangement, and that repayment would benefit all the taxpayer's customers without regard to whether they had paid the surcharge.

[6]Unlike *Oak Industries, Inc. v. Commissioner*, T.C. Memo. 1987-65, on the evidence before us, we cannot conclude that the customer deposits were intended to be used against balances due for services upon termination. In *Oak Industries*, all or a portion of the customer deposits were credited to final bills for between 61 and 70 percent of all customer terminations. In that case, all customers had to pay a customer deposit, the taxpayer paid no interest on customer deposits, and the taxpayer had a very well-developed, delinquent-account collection system.

the manner in which the taxpayer would have to dispose of the money in such fund or whether the taxpayer had to pay interest on the fund, nor did it require the special fund be segregated from the taxpayer's other funds. As a consequence, the taxpayer commingled money in the special fund with money from other funds; the special fund existed only as a series of bookkeeping entries. In 1979, the ICC determined that the special fund should accrue interest at a statutory rate and that the fund should be paid to certain customers (not the same customers who paid the new gas rate) through a monthly credit against such customers' gas bills. The Commissioner took the position that the taxpayer had a right to the fund and that therefore the fund was includable in its gross income. We applied the claim of right doctrine[7] and sustained such position. 83 T.C. at 895-898.

The Court of Appeals for the Seventh Circuit reversed our decision. *Illinois Power Co. v. Commissioner*, 792 F.2d 683 (1986). The Court of Appeals noted that the fact that the special fund was not segregated from the taxpayer's other funds was of little importance and concluded that the taxpayer was:

a custodian, a tax collector, with no greater beneficial interest in the revenues collected than a bank has in the money deposited with it.

\* \* \* \* \* \* \*

Where, unlike the case of a trustee or a collection agent or a borrower, the taxpayer's obligation to refund or rebate or otherwise repay money that he has received is contingent, the money is taxable as income to him. See, e.g., *Nordberg v. Commissioner*, 79 T.C. 655, 663-68 (1982), affd. without opinion, 720 F.2d 658 (1st Cir. 1983); Dubroff, "The Claim of Right Doctrine," 40 Tax L. Rev. 729 (1985). \* \* \* Prepayment of money owed, as in the case of a rent "deposit" that is to be applied to the last month of the lease, is treated as income when received, if the purpose is to pay for goods or services in advance rather than to secure the lessee's good behavior (in which event it must be refunded unless he misbehaves). See *City Gas Co. v. Commissioner*, 689 F.2d 943 (11th Cir. 1982), and cases cited there. There is nothing like that here; there is even less contingency than in the case of a lessee's security deposit, which when bona fide is, as just suggested, excluded from income. See *Clinton Hotel Realty Corp. v. Commissioner*, 128 F.2d 968 (5th Cir. 1942). \* \* \*

\* \* \* \* \* \* \*

The underlying principle is that the taxpayer is allowed to exclude from his income money received under an unequivocal contractual,

---

[7]*North American Oil v. Burnet*, 286 U.S. 417 (1932).

statutory, or regulatory duty to repay it, so that he really is just the custodian of the money. * * * [792 F.2d at 689.]

The issue and facts in the *Illinois Power* cases are, however, significantly different from those in the present case. In the *Illinois Power* cases, the issue, as framed by the parties and as decided by the court, involved the applicability of the claim of right doctrine. 83 T.C. at 895-898; 792 F.2d at 689-690. The special gas rate was in effect an energy tax. The customers were required to pay it, and they had no right to receive a refund of it. On the other hand, although the special fund was collected by the taxpayer, the ICC made clear, from the outset, that the taxpayer would not be allowed to keep the fund. Thus, the issue did not involve the tax treatment of deposits, and the rights to the special fund were significantly different from those of a depositor and a holder of deposits. In our judgment, the *Illinois Power* cases are distinguishable; nevertheless, it is interesting to observe that the effect of the decision by the Court of Appeals is to hold that the taxpayer was not taxable on the special fund to which it had no rights and that such result is similar to our conclusion that the petitioner is not taxable on the deposits with respect to which it had only minimal rights.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, CHABOT, NIMS, PARKER, WHITAKER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, JACOBS, WRIGHT, PARR, WILLIAMS, and WELLS, *JJ.*, agree with this opinion.

GERBER, *J.*, did not participate in the consideration of this opinion.