AMERICAN TELEPHONE AND TELEGRAPH COMPANY AND CONSOLIDATED SUBSIDIARIES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
American Tel. & Tel. Co. v. Commissioner
Docket No. 40990-85.
United States Tax Court
T.C. Memo 1988-35; 1988 Tax Ct. Memo LEXIS 36; 55 T.C.M. (CCH) 16; T.C.M. (RIA) 88035; February 3, 1988. Jerome B. Libin, Bradley M. Seltzer, Stephen F. Gertzman, Allan J. Stein, Susan Flax Posner, Martin J. Eisen and Lawrence H. Cohen, for the petitioners. David N. Brodsky, for the respondent. TANNENWALD
MEMORANDUM OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Year
Deficiency
1976
$ 91,707,185.00
1977
10,584,794.00
After concessions by petitioners, the principal issue for decision *37 is whether deposits collected and held by certain petitioners from certain customers were advance payments and therefore income in the year collected. If we so hold, then we must decide further issues as to how such deposits are to be reported as income. The facts have been fully stipulated. This reference incorporates the stipulation of facts and attached exhibits. American Telephone and Telegraph Co. (AT&T), a corporation with its principal office in New York, New York, and its consolidated subsidiaries (petitioners), [1] filed consolidated Federal income tax returns for the years 1976 and 1977 with the District Director of Internal Revenue in New York, New York. Petitioners used the calendar year as their taxable year and the accrual method of accounting for all items of income and expense for regulatory, book, financial and tax reporting purposes. Certain of petitioners were regulated public utilities engaged in the business of providing telephone services to the general public. These petitioners constituted the Bell Telephone System and will hereafter be *38 referred to as petitioners. Petitioners, other than AT&T, provided intrastate service to 80 percent of the nation's telephone users in all states, except Alaska and Hawaii, and in the District of Columbia. Petitioners provided interstate telephone service either alone or jointly with AT&T. The public utility commission of each state in which petitioners, other than AT&T, conducted business regulated the provision of intrastate telephone service. The Federal Communications Commission (FCC) regulated interstate telephone service provided by petitioners. As regulated public utilities, petitioners were required to provide telephone service to all applicants who satisfied credit-worthiness criteria [2] as well as to those applicants who were not able to satisfy such criteria but who provided petitioners with security deposits or other satisfactory security for payment. Petitioners collected deposits from both new and continuing customers who failed to meet the foregoing standards. During the years in issue, a representative group of petitioners [3] held deposits from approximately 6 percent of their customers. *39 Petitioners' rights and obligations regarding the collection, retention and refunding of customer security deposits were imposed by tariffs, administrative codes, orders and rules (tariffs) promulgated by the FCC or the relevant public utility commissions. These tariffs were supplemented by petitioners' business practices. The tariffs in every jurisdiction provided that the purpose of the deposit was to secure the customer's payment of telephone bills. Customers who provided deposits were billed by petitioners for all telephone services at the same rates and in the same manner as customers who did not provide deposits. Once a petitioner commenced providing telephone service to a customer, it was obligated to continue doing so until the customer terminated service or until it was authorized by applicable tariff to terminate the service. It was petitioners' policy and practice to consider termination of service to any existing customer only when the customer was clearly unwilling or unable to pay for such service. All tariffs imposed an obligation to refund deposits no later than the termination of service and, except for Delaware, either required or authorized refunds before *40 termination of service under certain circumstances. Pursuant to petitioners' business practices, deposits were refunded upon the earlier of the establishment of creditworthiness or the termination of service. Creditworthiness would be established through timely payment of consecutive monthly bills, typically for a period of 9 or 12 months. When a deposit was collected, petitioners would provide a receipt that identified the deposit as such. Petitioners informed their customers of their refund rights by furnishing explanations of them either orally or in writing by means of pamphlets, receipts or publication of information in telephone books. Refunds of deposits were made either in cash, by check or by crediting the customer's account. Generally, refunds made prior to termination of service were made in cash or by check. Those made when service was terminated prior to establishment of creditworthiness were made by credit to the customer's account, with any balance refunded by check. [4]
The following charts show the disposition of the deposits *41 collected by a representative group of pettioners, see note 3 supra, during 1976 and 1977: 1976(a)
Year
Refund by
Refund by Check
Refund by
Total
Made
Check(b)
and Credit(c)
Credit(d)
Refunds(e)
1976
3,765
4,882
15,540
24,187
1977
25,714
6,000
14,089
45,803
1978
7,265
1,650
3,368
12,283
1979
3,424
547
1,842
5,813
1980
1,742
331
786
2,859
Total
41,910
13,410
35,625
90,945
(a) All amounts in chart are in thousands. Deposits collected during 1976 totaled $ 100,196,000.
(b) Also includes nominal amounts refunded in cash.
(c) Column shows amounts refunded by check after credit to final bill left balance due to customer.
(d) Most credits were to customers final bills. Credits totaling $ 453,000, or .45% of the total deposits collected, were made to continuing customers' bill.
(e) At the end of 1980, $ 9,251,000, or 9.22% of the total deposits collected in 1976, were still held by petitioners. 1977(a)
Year
Refund by
Refund by Check
Refund by
Total
Made
Check(b)
and Credit
Credit(c)
Refunds(d)
1977
4,752
5,208
16,251
26,211
1978
32,168
6,529
15,493
54,190
1979
7,419
1,411
4,019
12,849
1980
3,297
583
1,443
5,323
1981
2,062
325
694
3,081
Total
49,698
14,056
37,900
101,654
*42 (a) All amounts in charts are in thousands. Deposits collected during 1977 totaled $ 109,258,000. (b) Also includes nominal amounts refunded in cash.
(c) Includes $ 351,000, or .32% of the total deposits collected, credited to continuing customers' bills.
(d) At the end of 1981, $ 7,604,000, or 6.96% of the total deposits collected, were held by petitioners. The following charts show the same figures restated as percentages of the total deposits collected: 1976
Year
Refund by
Refund by Check
Refund by
Total
Made
Check
and Credit
Credit
Refunds
1976
3.76%
4.87%
15.51%
24.14%
1977
25.66%
5.99%
14.06%
45.71%
1978
7.25%
1.65%
3.36%
12.26%
1979
3.42%
0.55%
1.84%
5.80%
1980
1.74%
0.33%
0.78%
2.85%
Total (a)
41.83%
13.38%
35.56%
90.77%
(a) Minor discrepancies in totals are due to rounding. 1977
Year
Refund by
Refund by Check
Refund by
Total
Made
Check
and Credit
Credit
Refunds
1977
4.35%
4.77%
14.87%
23.99%
1978
29.44%
5.98%
14.18%
49.60%
1979
6.79%
1.29%
3.68%
11.76%
1980
3.02%
0.53%
1.32%
4.87%
1981
1.89%
0.30%
0.64%
2.82%
Total (a)
45.49%
12.86%
34.69%
93.04%
*43 (a) Minor discrepancies in totals are due to rounding. Under the tariffs, petitioners were obligated to pay interest on deposits at prescribed rates. During the years at issue, petitioners paid interest at an annual rate of at least 5.5 percent, and as much as 8 percent, on deposits. During those years, the prime interest rate charged by commercial banks ranged from 6 to 8 percent. Interest generally was paid either at the time the deposit was refunded or, in some states, on an interim basis before refund. In some states, the deposit had to be held for a minimum period before interest would be payable, but, except in North Carolina, once that period was met interest was computed from the date the deposit was received. Pursuant to the laws in effect in virtually all states, unclaimed deposits did not become property of petitioners but instead escheated after a prescribed period. At least $ 45,600 of deposits collected by petitioners in earlier years escheated during 1976 and 1977, and at least $ 2,555,100 of all deposits collected by petitioners escheated during the years 1976 through 1986. The cash received by petitioners as deposits was not physically segregated from *44 petitioners' general funds, but was commingled with other receipts. Subject to the requirements relating to payment of interest and escheat, petitioners had unrestricted use of such cash while held. As regulated public utilities, petitioners were required to use as their accounting manual the Uniform System of Accounts adopted by the FCC, the public utility commissions and the National Association of Regulatory Utility Commissioners. In accordance with section 160 of the Uniform System of Accounts, 47 C.F.R. sec. 31.160 (1986), petitioners treated customer deposits as current liabilities, not as income, for Federal and state regulatory and tax purposes. Petitioners' tax treatment of deposits conformed to their treatment of such deposits for book and financial purposes. Such treatment was consistent with generally accepted accounting principles, clearly reflected income for financial accounting purposes, has been used consistently throughout the telephone industry for many years, and has been accepted and approved by petitioners' independent accountants. *45 Under section 61(a), [5] gross income includes all income from whatever source derived, including compensation for services. Section 451(a) provides that items of gross income are to be included in gross income in the year received unless under the taxpayer's method of accounting they are properly includable in another period. Advance payments of income must be included in income in the year received. Schlude v. Commissioner,372 U.S. 128 (1963). In characterizing payments made as "deposits," we have analyzed the surrounding facts and circumstances to determine whether they were in fact deposits subject to refund or advance payments includable in gross income. See Indianapolis Power & Light Co. v. Commissioner,88 T.C. 964 (1987) (Court reviewed) (on appeal, 7th Cir., Aug. 31, 1987) (holding that deposits collected from utility customers were not income); City Gas Go. of Florida v. Commissioner,74 T.C. 386 (1980), revd. 689 F.2d 943 (11th Cir. 1982). In reversing City Gas, the Eleventh Circuit Court of Appeals held that *46 payments should be characterized based on the "primary purpose" for which they were made, and stated that the deposits could be made for one of two purposes -- either as advance payments for services, which would be includable in gross income, or as security for non-income producing covenents in the contract, which would not be so includable. See 689 F.2d at 946. Initially, respondent invites us to abandon the facts and circumstances test and adopt the primary purpose test enunciated by the Eleventh Circuit. In support of his position, respondent has favored us with an extended discussion of several cases holding that various advance payments are includable in income. In Indianapolis Power, we analyzed and distinguished the cases and stated "After reviewing these cases, we conclude that they do not support the rule * * * which is urged upon us by the Commissioner. *47 " 88 T.C. at 976. We see no purpose to be served in repeating that analysis. Our considered judgment is that our previous analysis and conclusion was and is correct. Accordingly, we decline respondent's invitation. [6]
Respondent also contends that the customer deposits herein should *48 be treated as advance payments for services and thus income in the year of receipt under the fact and circumstances test of Indianapolis Power. We disagree. We think that any distinctions between the facts herein and those involved in Indianapolis Power are distinctions without a difference. In analyzing the facts and circumstances surrounding collections of deposits from petitioners' customers, we have looked to several specific factors. These include whether deposits were required of all customers and how the customers from whom deposits were required were chosen, the customer's and petitioner's respective rights in and control over the money deposited, and whether petitioners treated the deposits as money belonging to another person. While we consider specific factors, we do not merely count them but rather consider them in the context of the record as a whole. [7]
*49 Collection of deposits from a limited number of customers tends to indicate that the deposits are not advance payments of income, as does choosing these customers from whom deposits are to be collected on the basis of their creditworthiness. As we noted in Indianapolis Power, "it is very significant that most customers were not required to make deposits." 88 T.C. at 976. Here, petitioners required deposits from only 6 percent [8] of their customers--those that they did not consider to be creditworthy, based on objective factors such as payment record for prior utility service, employment, property ownership and general credit history.[9] It is also significant that petitioners would accept other forms of security, for example, guarantees of payment, in lieu of deposits. *50 The fact that the customer retained significant control over when and how the money paid to petitioners was refunded, as well as the converse -- that petitioners had little control over and few rights in the ultimate disposition of the money deposited--also indicates that the money was not an advance payment of income. Here, as in Indianapolis Power, the customer had the right to control when the deposit was refunded. The customer could secure a refund by meeting petitioners' creditworthiness criteria--essentially by making timely payment of consecutive bills for a fixed period of time, usually 12 months. At that time, the deposit would be automatically refunded. At the time of making the deposit, customers were informed of their refund right. Nearly 42 percent of the 1976 deposits, and over 45 percent of the 1977 deposits, collected by petitioners were so refunded in the first five years after they were collected. [10]
It is true that *51 the customer did not have direct control over the manner in which the refund was made. If a refund was to be made to a continuing customer, it was made in cash or by check; while, if the refund was to be made at the termination of service, the amount of the deposit was first credited to the customer's final bill and only the balance was refunded. The fact remains, however, that the customer had indirect control, because he had control over whether his bills were paid and thus whether the deposits were actually refunded while service continued or credited to the final bill when service was terminated. [11] By crediting a customer's bill with amounts on deposit at termination of service, petitioners were merely exercising a right of set off or recoupment, whereby they deducted amounts they were owed from amounts that they owed to the same person before repaying their debt, and avoiding the expense and bookkeeping difficulties of writing additional checks. *52 Petitioners' rights in the deposits were minimal. Credits of the amount of the deposit to customers' bills could be initiated by petitioners only when a customer was terminating service, either voluntarily or involuntarily because of non-payment of bills. Petitioners did not benefit from the deposits that were not refunded in some manner -- they escheated to the state. [12] Thus, while the customer's right to a refund was contingent, petitioners' ultimate rights in the deposit were not fixed at the time the deposit was made, or in fact at any time before service was terminated or the deposit was refunded. [13] Finally, the fact that the deposits were commingled with petitioners' other funds does not indicate that petitioners had anything but minimal rights in the money. See Clinton Hotel Realty Corp. v. Commissioner,128 F.2d 968, 970 (5th Cir. 1942). *53 The fact that petitioners treated the deposits as belonging to their customers also indicates that the deposits were not payments of income. While payment of interest on the deposit is not determinative, neither is it to be ignored as respondent would have us do. Indeed we have previously held that payment of interest "is of particular importance" in deciding whether petitioners treated the money collected as their own or as their customers'. Indianapolis Power & Light Co. v. Commissioner,88 T.C. at 976. [14] Here, interest was paid at an annual rate of between 5.5 and 8 percent, close to the prime rate charged by commercial banks during the years in issue. In addition, in accordance with regulatory requirements and with generally accepted accounting principles, petitioners treated the deposits as current liabilities. [15] Again, the fact that the deposits were commingled with petitioners'' other cash does not indicate that petitioners considered them to be their own, given that separate records were kept of what was owed to each customer and that an offsetting liability was recorded. *54 In summary, based on all the facts and circumstances herein, we hold that the deposits collected by petitioners in the years in issue were customer deposits subject to refund, and therefore not includable in gross income, rather than advance payments includable in gross income. In view of this holding, we need not address the further issues argued by the parties as to how the deposits would be accounted for as taxable income in the year of receipt. To reflect the foregoing and concessions by petitioners, Decision will be entered under Rule 155.
Footnotes
1. AT&T's subsidiaries were divested and ceased to be members of the affiliated group on January 1, 1984. ↩
2. Petitioners' credit criteria included the applicant's payment record for prior utility service, employment record, property ownership, credit references and general credit history. ↩
3. Data relating to deposits collected by all petitioners are not available. The parties have agreed that data relating to deposits collected by 6 petitioners (Southern Bell Telephone and Telegraph, Southwestern Bell Telephone, Chesapeake and Potomac Telephone Co. of Maryland, Pacific Telephone and Telegraph, New York Telephone and Mountain States Telephone and Telegraph) in 11 states is representative of deposits collected by all petitioners. ↩
4. In most states, the procedure of making refunds to terminating customers by first crediting final bills was required by tariffs. ↩
5. Unless otherwise noted, all section references are to the Internal Revenue Code as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
6. We note particularly that, in Indianapolis Power & Light Co. v. Commissioner,88 T.C. 964 (1987), we specifically distinguished Oak Industries, Inc. v. Commissioner,T.C. Memo. 1987-65, upon which respondent relies to illustrate the alleged difficulties with the "facts and circumstances" test. See 88 T.C. at 978 n.6. The one case in which we applied only the "primary purpose" test, Gas Light Co. of Columbus v. Commissioner,T.C. Memo. 86-118, was appealable to the Eleventh Circuit, so we were required to do so. Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). We therefore find little precedential value in either Gas Light Co.'s↩ use of the primary purpose test or in its analysis of the particular facts and circumstances present in that case. 7. We note that, while petitioners as a group conducted business in all of the continental United States, each petitioner was individually regulated by one or more Federal or state regulatory agencies, so that the exact regulatory requirements under which each operated could and did vary. In addition, the business practices of each petitioner varied. In their briefs, however, the parties have assumed that these differences are not material. After reviewing the stipulation of facts and our findings of fact, we agree with this assumption. ↩
8. The parties have stipulated that statistics relating to collections and refunds of deposits from a sample of petitioners are representative of collections and refunds of deposits by all petitioners. We will therefore treat those statistics as if they applied directly to all petitioners. ↩
9. We note that deposits may not be includable in gross income even if they are collected from all new customers, see City Gas of Florida v. Commissioner,74 T.C. 386, 388 (1980), revd. 689 F.2d 943 (11th Cir. 1982), and may be includable even though not collected from all. See Van Wagoner v. United States,368 F.2d 95, 96↩ (5th Cir. 1966). 10. We note that more than 40 percent of refunds made by credit to bills (43.6 percent in 1976 and 42.5 percent in 1977) were made during the first year of service, that is, before creditworthiness could, in general, be established. ↩
11. We note that, in general, this procedure was mandated by the tariffs under which petitioners operated, so that petitioners also had little control over the manner in which the refund was made. In any event, we think that this is only a minor difference from the practice in Indianapolis Power,↩ where refunds to continuing customers could be by credit to the bill and a customer could request to have the the full deposit actually refunded if the refund was made at termination of service. 12. This is a significant distinction from Oak Industries, Inc. v. Commissioner,T.C. Memo. 1987-65, where we held that deposits given to a pay television service were income to the service in the year received. In that case, unclaimed deposits did not escheat to the state. In addition, because unclaimed deposits escheat, we do not give any weight to the fact that petitioners still retained some of the deposits made in 1976 and 1977 after five years. As petitioners point out, those deposits had either been made by customers who were unable to establish credit after five years or were made by customers who petitioners could not locate, in which case they eventually would escheat. ↩
13. Therefore, cases holding that payments subject to a contingent repayment obligation are income are distinguishable. E.g., Nordberg v. Commissioner,79 T.C. 655 (1982), affd. without opinion 720 F.2d 658 (1st Cir. 1983). Here, while the customer's right to the refund of the deposit was contingent on establishing creditworthiness (or terminating service before credit was established), petitioners' right to retain the deposit was also contingent on the provision of service and the customer's subsequent nonpayment for the service. See City Gas of Florida v. Commissioner, supra, at 394. Cf. Illinois Power Co. v. Commissioner,792 F.2d 683 (7th Cir. 1986), revg. in part 83 T.C. 842↩ (1984) (payments held by utility and subject, at the time they were collected, to refund, to unspecified customers, held not income). 14. See also Van Wagoner v. United States, supra at 98, and Oak Industries, Inc. v. Commissioner,T.C. Memo. 1987-65, where no interest was paid and the deposits were held to be income. In at least two cases, both relating to real estate leases, courts have held that deposits bearing interest were in fact prepayments of income. United States v. Williams,395 F.2d 508 (5th Cir. 1968); Commissioner v. Lyon,97 F.2d 70↩ (9th Cir. 1938), affg. a Memorandum Opinion of this Court. In both those cases, the principal amount of "loans" was to be repaid by forgiving rental payments. Here, petitioners had an obligation to repay the deposits that was independent of providing future service to their customers if the customers paid their bills. 15. We recognize that neither regulatory accounting nor financial accounting practices are determinative for purposes of tax accounting. Commissioner v. Idaho Power,418 U.S. 1 (1974); Thor Power Tool Co. v. Commissioner,439 U.S. 522 (1979). They are, however, both relevant to making the determination as to whether the deposits at issue here were or were not income. Cf. Idaho Power,418 U.S. at 15. We give little weight, however, to the accounting characterization of the deposits as liabilities; because, under generally accepted accounting principles, an accrual basis entity will treat all customer advances, including those that are clearly income items, as liabilities until they are earned, Financial Accounting Standards Board, Accounting Standards B05.107A (1987); W. Meigs, A. Mosich, C. Johnson, Intermediate Accounting 397 (1978); and the FCC's Uniform System of Accounts treats both deposits and advance bill payments as current liabilities. See 47 C.F.R. sec. 31.160 (1986) (customer deposits); 47 C.F.R. sec. 31.164↩ (1986) (advance bill payments).